

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-2-2006

# Sanford v. Stiles

Precedential or Non-Precedential: Precedential

Docket No. 04-4496

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Sanford v. Stiles" (2006). *2006 Decisions.* Paper 542.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/542

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 04-4496

KATHLEEN SANFORD, Individually and as Administratrix of
the Estate of
Michael R. Sanford,
*Appellant*

v.

PAMELA STILES; DENNIS MURPHY;
EAST PENN SCHOOL DISTRICT

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 03-cv-05698)
District Judge: Honorable Lawrence F. Stengel

Argued November 14, 2005

Before: FUENTES, BECKER,[*] and ROTH[**] *Circuit Judges*.

(Filed: August 2, 2006)

Robert G. Bauer (ARGUED)

_____

[*]Judge Becker sat on the panel in this case and did substantial work in the drafting of this opinion. However, he died before the opinion was filed. The decision is filed by a quorum of the panel. *See* 28 U.S.C. § 46(d).

[**]Judge Roth assumed senior status on May 31, 2006.

Abraham, Bauer & Spalding
1600 Market Street, 5th Floor
Philadelphia, Pennsylvania 19103

C. Theresa Barone
Nelson, Levine, de Luca & Horst
4 Sentry Parkway, Suite 300
Blue Bell, Pennsylvania 19422
*Attorneys for Appellant*

Anne E. Hendricks (ARGUED)
Paul N. Lalley
Levin Legal Group
1800 Byberry Road
1301 Masons Mill Business Park
Huntingdon Valley, Pennsylvania 19006
*Attorneys for Appellees*

———

OPINION OF THE COURT

———

PER CURIAM

This case arises out of the unfortunate death of Michael Sanford, a sixteen-year-old boy who committed suicide at his home in Emmaus, Pennsylvania. Kathleen Sanford, Michael's mother, appeals the District Court's grant of summary judgment against her in an action against the East Penn School District and one if its guidance counselors, Pamela Stiles ("the Defendants"). Kathleen Sanford filed suit under 42 U.S.C. § 1983, alleging that the Defendants are liable for her son's death under a state-created danger theory. She also alleges that Pamela Stiles is individually liable for negligence under state law. We will affirm the grant of summary judgment against Sanford.

This case requires us to examine and clarify an unsettled area of the law: the standard of fault in state-created danger cases. As we have noted before, the relevant question – whether a state

actor's behavior "shocks the conscience" – has an elusive quality to it.[1] This is in part because the level of culpability required to shock the conscience will depend upon the extent to which a state actor is required to act under pressure. In the present case, we are satisfied that Kathleen Sanford's state-created danger claims cannot prevail because she is unable to show that Stiles or the East Penn School District acted with the requisite level of culpability. We also must reject Sanford's state law negligence claim because Stiles is entitled to broad immunity under the Pennsylvania Political Subdivision Tort Claims Act.

## I. Facts and Procedural History

The events in this case began when Karen Martin, a high school student, received a troubling note from classmate Michael Sanford.[2] Karen and Michael had dated for a brief period. Karen was passed the note on November 26, 2002, after Michael learned that she was dating a student named Ryan. The note stated:

> I know I really haven't talked to you in awhile. Hopefully this note doesn't come out the wrong way. I've heard 3 diff[erent] stories about you & Ryan. The one I heard *almost made me want to go kill myself*. Mostly because if there was any chance in hell of you & me solving the what if's I fucked it up. Anyways I heard that instead of Danielle it was you online Friday. If I said anything stupid, I apologize (this weekend sucked & I've tried to make myself forget it). So how have you been? How's driving going? Remember stop signs w/ white lines around them are optional & if you hit a pedestrian @ nite & he's wearing black its 100 pts. For some reason, I

---

[1]*See, e.g.*, *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005) (hereinafter "*Smith II*") (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 509 (3d Cir. 2003) (hereinafter "*Smith I*")).

[2]Hereinafter, for ease of reference, we refer to Michael Sanford as "Michael" and Kathleen Sanford as "Sanford."

just thought this & have to ask you, is there any grudge or an[imosity] btwn us? I g2g. Write back if you can, if not hopefully I ttyl. Luv ya. Ur ex-husband, Mike.

(App. 41 (emphasis added).)

Karen indicated several times that, after reading Michael's note, she did not believe that Michael would actually kill himself. Still, the day after receiving the message, Karen approached a school guidance counselor, Barbara Valladares, about the note's contents. Karen claimed that she was worried about Michael and that she was sick of him "bugging" her. Karen told Valladares that she "didn't think" Michael would hurt himself but that she just "wanted to be safe." (App. 462.) Karen asked Valladares not to reveal the source of the note.

Valladares gave a copy of the note to Michael's guidance counselor, Pamela Stiles, and relayed both that Karen "wanted Michael to stop bothering her" and that Karen was concerned about Michael's reaction to their earlier breakup. (App. 236.) Stiles immediately called Michael into her office. She told Michael that some of his friends were worried about him, and that therefore she was worried about him. Stiles asked Michael if he was upset about some sort of situation with a girl, and he replied: "that was two months ago when I was upset about that. I'm not upset about that now." (App. 280.) According to Stiles, Michael responded in a "very straightforward" manner. (App. 255.)

Additionally, Stiles asked Michael if he ever had plans to hurt himself or if he would do such a thing. He answered "definitely not." (App. 256.) She asked him "forward thinking" questions and became satisfied that he had future plans. (App. 256-57.) Finally, Stiles asked Michael if anything else was upsetting him. According to Stiles, Michael stated, "no, he was fine." (App. 257.)

Stiles later reported that Michael "kind of shrugged that [she] would even ask him these questions or if there was a problem." (App. 257.) Stiles was convinced that the feelings expressed in the note dated several months back. She concluded

that "Mike did not present any signs . . . that were of a nature that he was thinking about harming himself." (App. 280.) Therefore, because she believed Michael was not at risk, she did not contact the school psychologist or Michael's mother.

According to Stiles, she and Michael spoke for ten to fifteen minutes during this first encounter. Stiles then gave the note back to Valladares and "told her that [she] had seen Michael and that he did not display any suicidal ideation to [her] in what he verbalized." (App. 259.) Also, Jason Pekarik, a friend of Michael's, later testified that Michael told him that he had been called into the guidance office. According to Pekarik, Michael "laughed about it" and said that "everything was fine." (App. 647.)

On December 4, 2002, Michael again visited the guidance office. Stiles stated that she asked Michael if he would like to come in, but that Michael only asked Stiles if it was a "blond-haired girl" who gave her the note. (App. 264.) Stiles said that she could not share that information. She stated in her deposition that this was because of ethical practices aimed to help students "feel comfortable giving information." (App. 264, 266.) Stiles invited Michael to talk further. However, Michael only responded: "thanks, I thought that's what you would say. That's all I needed." (App. 264.) According to Stiles, Michael "did not seem upset" during their interaction. (App. 268.)

That evening, Michael committed suicide by hanging himself. Immediately before his death, Michael and his mother had argued. Sanford believed that the argument occurred because she told Michael to take his sweatshirt off and to close the car windows. According to Sanford, Michael "opened up the car door while it was still going" and started to run home. (App. 847-48.) Sanford looked for Michael, but when he saw the car, he "took off again." (App. 848.) At one point, Michael again entered the car, but he only threw some of Sanford's cigarettes out of the car, then walked the short distance home. After they had both returned home, Sanford asked Michael to clean the kitchen. When Sanford went down to look for him, she found that he had hanged himself from a door in the basement.

As the District Court noted, no one, including Sanford,

5

Karen Martin, or Michael's uncle believed that Michael was suicidal. Michael's uncle, David Schlegel, was a licensed social worker and had worked as a therapist. Schlegel testified that Michael seemed "happy-go-lucky" before his death and that there were no signs that he would harm himself. Additionally, shortly before Michael's death, Sanford had read an instant message exchange between Michael and his friend Jason Pekarik. The messages referenced suicidal behavior. Still, after reading the messages, Sanford was not concerned that Michael could be suicidal.

It appears that Stiles followed school protocol in making her assessment of Michael. The Emmaus High School Counseling Department Guidelines Handbook delineates a "Suicide Referral Process." That protocol states:

> In cases of suicide ideation, the assigned counselor will assess the situation no matter what the referral source (SAP, teacher, parent, and self-referral). The counselor will determine if and when a referral should be made to the school psychologist.

(App. 85.) A flow chart provides further information.

Sanford filed this action against Stiles and the East Penn School District in the District Court for the Eastern District of Pennsylvania. She alleged that the Defendants were liable for Michael's death under a state-created danger theory for constitutional violations pursuant to 42 U.S.C. § 1983. She also alleged that Stiles was individually liable for negligence under state law. The Defendants filed a motion for summary judgment, which the District Court granted.[3]

---

[3]We have jurisdiction to review the District Court's determination under 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary and "we must grant all reasonable inferences from the evidence to the non-moving party." *See Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.4 (3d Cir. 1997); *see also Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 246-47 (3d Cir. 2002).

6

The District Court determined that the substantive due process claims brought against both Defendants failed. Specifically, a reasonable jury could not conclude that Stiles "create[d] the danger" to Michael or that her conduct exceeded mere negligence. The District Court also rejected Sanford's claim of municipal liability against the East Penn School District because Sanford failed to create a genuine issue of material fact as to whether Stiles caused an underlying constitutional violation. Finally, the District Court rejected the state law negligence claim against Stiles both because Sanford could not prove causation under tort law and because Stiles was entitled to immunity under Pennsylvania law.

## II. Substantive Due Process: Sanford's State-Created Danger Claim Against Stiles

Sanford alleges that Stiles is liable under a state-created danger theory because her actions "increased the risk that Michael would commit suicide." (Appellant's Br. at 14.) Generally, the Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals. *See DeShaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 198-200 (1989). However, we have explicitly recognized two exceptions to this general rule. First, the state has a duty to protect or care for individuals when a "special relationship" exists.[4]

---

[4]This Court has generally stated that this first exception, derived from *DeShaney*, requires a custodial relationship. It is a very limited exception. For example, we have read *DeShaney* "primarily as setting out a test of physical custody." *Torisky v. Schweiker*, 446 F.3d 438, 445 (3d Cir. 2006) (citation omitted). A "deprivation of liberty" through, for example, incarceration or institutionalization, is required. *See id.* at 444.

No "special relationship" existed here. In *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992), we held that no special relationship exists between school children and the state. This is because parents decide where their children's education will take place, because school children "remain resident in their homes," and because "the child is not physically restrained from leaving school during school hours." *Id.*

Second, the state has a duty when a "state-created danger" is involved. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997). Sanford's federal claims are based on this second exception.

In *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996), we first adopted the state-created danger theory as a mechanism by which plaintiffs may establish constitutional violations under 42 U.S.C. § 1983. We confirmed that liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process. *Id.* at 1205; *see also Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003). The state-created danger theory is now widely recognized. Although the Supreme Court has not yet explicitly adopted it, a majority of our sister circuits have implemented some variation of the theory.[5]

---

at 1371-73; *see also Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (finding that, in another context, "[t]he schoolchild has little need for . . . protection" because "the public school remains an open institution").

[5]*See Pena v. Deprisco*, 432 F.3d 98, 107-10 (2d Cir. 2005); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993); *Forrester v. Bass*, 397 F.3d 1047, 1057-59 (8th Cir. 2005); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995); *Butera v. District of Columbia*, 235 F.3d 637, 648-51 (D.C. Cir. 2001); *see also Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 567 (11th Cir. 1997) ("The language of *DeShaney* does indeed 'leave room' for state liability where the state creates a danger or renders an individual more vulnerable to it."). *But see Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 80 (1st Cir. 2005) ("This court has, to date, discussed the state created danger theory, but never found it actionable on the facts alleged.") (internal quotation marks and citation omitted); *Pinder v. Johnson*, 54 F.3d 1169, 1176 n.* (4th Cir. 1995); *Rios v. City of Del Rio*, 444 F.3d 417, 422 (5th Cir. 2006) (noting that "this court has frequently spoken of the

To prevail on a state-created danger claim in the Third Circuit, a plaintiff must prove the following four elements:

>（1) the harm ultimately caused was foreseeable and fairly direct;

>(2) a state actor acted with a degree of culpability that shocks the conscience;

>(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

>(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted); *see also Smith II*, 430 F.3d at 153 (quoting an earlier version of the test).

Sanford maintains that Stiles created the risk of Michael's death by, for example, holding herself out as a source of aid to Michael, cutting off other possible avenues of help, undertaking an assessment of Michael without proper training, improperly evaluating his risk, and deciding not to contact the school psychologist or a parent. Sanford's claim against Stiles fails because she is unable to show at least two of the four required elements of a state-created danger claim. Specifically, no reasonable jury could find (1) that Stiles acted with the requisite degree of culpability, or (2) that she "create[d] an opportunity that otherwise would not have existed for [harm] to occur." *Smith II*, 430 F.3d at 153. Therefore, we will affirm the judgment of the District Court. We examine the two elements in question, prongs

'state-created danger' theory," but has never adopted it).

two and four, in turn.[6]

A.    *Prong Two: The Standard of Culpability*

Because the culpability requirement is often the most difficult element for a plaintiff to prove, the outcome of a state-created danger case will often turn on this prong. *See id.* The Supreme Court has not fully explicated the standard of culpability in substantive due process cases generally, and our own jurisprudence is difficult to discern. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (noting that a complete analysis of the fault requirement in substantive due process cases is "a matter for closer calls"). We now attempt to clarify this difficult area of the law.

i.    *Jurisprudence on the Standard of Culpability*

In assessing the standard of fault in state-created danger cases, we have inquired in the past whether "the state actor acted in willful disregard for the safety of the plaintiff." *See, e.g.*, *Morse*, 132 F.3d at 908 (quoting *Kneipp*, 95 F.3d at 1208). More recently, largely in consideration of the Supreme Court's decision in *Lewis*, 523 U.S. at 847-49, we have acknowledged that the fault inquiry requires asking whether the state official "acted with a degree of culpability that shocks the conscience." *See, e.g.*, *Bright*, 443 F.3d at 281.

The Supreme Court decided *Lewis* nearly two years after we issued our opinion adopting the state-created danger theory in *Kneipp*. The Court granted certiorari to resolve a conflict among the circuits as to the standard of culpability for due process violations in the context of a police chase. *Lewis*, 523 U.S. at 839. The Court held that generally, in a due process challenge to executive action, the threshold question is whether the government officer's actions "shock the contemporary conscience." *Id.* at 847

---

[6]We assume without deciding that Sanford has raised an issue of fact for summary judgment purposes as to the first and third prongs.

n.8. The Court determined that in the specific context of a high-speed police pursuit, only an "intent to harm" the plaintiff could shock the conscience. *Id.* at 854. However, the Court stated that whether behavior rises to the level of conscience-shocking will depend upon the facts of each individual case. *Id.* at 850 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory.").

The Court suggested that in some instances, conduct involving more than negligence but less than intentional conduct could be "shocking" in the constitutional sense. Therefore, deliberate indifference, or perhaps gross negligence or recklessness, could be sufficient. *Id.* at 849-50. In discussing the importance of context, the Court compared a high-speed chase or a prison riot on one hand with decisions regarding the medical needs of custodial prisoners on the other. *Id.* at 849-52. In the latter custodial situation, deliberate indifference to the medical needs of prisoners would likely be sufficient because the state actor could engage in "actual deliberation" and "unhurried judgments." *Id.* at 851, 853. In the former situation, where deliberation is impossible, the higher standard of "intent to harm" would be required. *Id.* at 854. Of course, we note that *Lewis* was not a state-created danger case but rather dealt with substantive due process generally.

Following *Lewis*, we have stated that in substantive due process cases, "[t]he exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). And we have had occasion to reflect on the appropriate standard of fault in a number of different settings. Sometimes, an intent to cause harm has been required; other times, deliberate indifference has been sufficient. In *Miller*, 174 F.3d at 375-76, we first utilized a standard part way between intent to harm and deliberate indifference. In that case, a Department of Human Services social worker believed that two children were victims of domestic abuse, based on reports by daycare personnel, videotape footage of the children's injuries, and statements made by the children themselves. *Id.* at 371. The children were removed almost immediately from their mother's custody after an order was issued by an on-call emergency judge. *Id.* After custody was restored, the children's mother filed a

11

substantive due process suit against the social worker, alleging that he had pursued his investigation without probable cause, misrepresented facts to an assistant city solicitor, and induced a children's hospital doctor to perjure himself. *Id.*

We stated that the social worker's actions, leading to the emergency order to separate parent and child, involved less urgency than a high-speed chase but more urgency than a decision involving the medical care of a prisoner. *Id.* at 375-76. Therefore, we applied a standard of fault between "deliberate indifference" and "purpose to cause harm." *Id.* at 375. We defined this new standard as "gross negligence or arbitrariness that indeed 'shocks the conscience.'" *Id.* at 375-76. This standard was created to apply to cases in which no immediate or split-second decision was required, but where officials nonetheless did not have the luxury of true deliberation. As a result, we had articulated three possible standards to determine whether behavior rose to the level of conscience-shocking: 1) deliberate indifference; 2) "gross negligence or arbitrariness that indeed 'shocks the conscience"; and 3) intent to cause harm. We concluded that the middle standard had not been met, relying in part on the fact that there was "substantial evidence . . . that the children were in danger of abuse." *Id.* at 377. Like *Lewis*, *Miller* was not a "state-created danger" case, and is therefore distinguishable on that basis. However, given the subsequent incorporation of *Miller* into our state-created danger case law, we find it highly instructive.

In *Nicini v. Morra*, 212 F.3d 798, 800-01 (3d Cir. 2000) (en banc), we reviewed a substantive due process claim brought by a minor against a New Jersey Department of Human Services caseworker who placed him in the equivalent of a foster home. Nicini was clearly very troubled and had apparently made two suicide attempts in the past. *Id.* at 801. After Nicini was sexually abused by one of the parents in his new foster home placement, he filed suit against the caseworker. He alleged that the caseworker failed to properly investigate the background of the foster parent, and that the caseworker knew or should have known that the

12

placement was inappropriate.[7] *Id.* at 804. We assessed the caseworker's actions under the deliberate indifference standard, declining to impose the heightened standards utilized in *Lewis* and *Miller*. *Id.* at 811. We explicitly distinguished *Miller* because the caseworker in *Nicini*, unlike the social worker in *Miller*, had "time 'to make unhurried judgments'" in investigating whether to permit the child to remain in the foster care in which he was placed. *Id.* (quoting *Lewis*, 523 U.S. at 853).

Roughly two years later, in *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 58-59 (3d Cir. 2002), a plaintiff brought a substantive due process claim against two paramedics, asserting that their careless actions in lifting him from a fall rendered him a quadriplegic. Rather than immobilizing the plaintiff's cervical spine before they moved him from the ground, the paramedics quickly lifted him and allegedly caused his injuries. *Id.* at 60.

We noted that *Miller* was binding and that the standard of culpability discussed there – a standard more rigorous than deliberate indifference – should apply. *Id.* at 65. However, we determined that the language in *Miller* – "gross negligence or arbitrariness that indeed 'shocks the conscience'" – was not intended as a "precise articulation." *Id.* at 65. Specifically, we noted that arbitrariness is a general requirement for substantive due process violations and that gross negligence encompasses a lower level of intent than deliberate indifference. *Id.* at 66 n.6.

In attempting to elucidate and apply the level of culpability

---

[7]*Nicini* also was not a state-created danger case. There, potential liability was based upon the "special relationship" that existed between the minor and the state. *Id.* at 809. We first found that the state had an affirmative duty to protect the child under the Due Process Clause. To that end, we held that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties." *Id.* at 808. Failure to perform those duties could give rise to a cause of action under § 1983. We then went on to determine whether the caseworker's conduct was "egregious enough" to amount to a constitutional violation. *Id.* at 809.

required in *Miller*, we noted that the case "appear[ed] to have demanded proof of something less than knowledge that the harm was practically certain but more than knowledge that there was a substantial risk that the harm would occur." *Id.* at 66. We formulated the following standard for circumstances where no instantaneous decision is necessary, but where the state actor also does not have the luxury of proceeding in a deliberate fashion: A plaintiff must show that the "defendant[] consciously disregarded, not just a substantial risk, but a *great* risk that serious harm would result." *Id.* (emphasis added).[8]

We next decided *Estate of Smith v. Marasco*, 318 F.3d at 506, or *Smith I*, in which the plaintiffs explicitly brought a state-created danger claim. As in *Ziccardi* and *Miller*, we believed that the situation in *Smith I* demanded a standard for conscience-shocking behavior that was between deliberate indifference and intent to cause harm. Specifically, we examined the appropriateness of state police officers' decision, *inter alia*, to activate a Special Emergency Response Team. *Id.* at 508-09. We determined that the relevant decisions were not made in a "hyperpressurized environment." *Id.* at 508.

Not acknowledging *Ziccardi*, we utilized the articulation earlier formulated in *Miller*. We reiterated that in situations falling in the grey area between requiring "true split-second decisions" and allowing "relaxed deliberation," liability may be found if an official's conduct "exhibits a level of gross negligence or arbitrariness that shocks the conscience."[9] *Id.* at 509.

---

[8]*Ziccardi* created a new articulation for the mid-level standard first discussed in *Miller*. The *Ziccardi* Court explicitly recognized that the case before it was not a "state created danger" case and therefore was not governed by *Kneipp* and its progeny. *Id.* at 65 n.5. In *Ziccardi*, the plaintiff alleged that he was harmed directly by Philadelphia Fire Department paramedics and the city. *See id.* at 58-59.

[9]Following *Smith I*, we decided *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572 (3d Cir. 2004). There, we found that the deliberate indifference standard would apply to the question whether employees of a juvenile detention center violated the plaintiff's substantive due process rights in failing to protect

14

It was not until we decided *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004), that we first explicitly acknowledged the heightened standard in *Ziccardi* in a state-created danger case.[10] There, we considered a family's claim that two emergency medical technicians exposed a seizure victim to danger by calling the police and reporting that the victim attacked them, but failing to warn the officers that the victim had suffered a seizure. *Id.* at 185-88. Upon arrival, the police restrained the man, allegedly causing his death. *Id.* at 200. We echoed the *Ziccardi* reiteration of *Miller*, stating at one point that a reasonable jury could conclude that the technicians "consciously disregarded a great risk of serious harm to [the victim]."[11] *Id.* at 196.

Finally, in *Smith II*, 430 F.3d at 153-56, we again considered the elusive fault requirement, though in the context of qualified immunity. We first noted the inherent difficulty in determining whether conduct "shocks the conscience." *Id.* at 153 (quoting *Smith*

him from assault by other residents. *Id.* at 579, 587. We determined that split-second decisions were not required because "forethought about [a resident's] welfare [was] not only feasible but obligatory." *Id.* at 579 (first alteration in original) (internal quotation marks and citation omitted). Specifically, "child-care workers . . . had the opportunity over a five-week period to see a pattern of physical assaults . . . emerging . . . and develop a plan to protect A.M. from assaults by other residents." *Id.* at 587. Our holding also rested in part upon the custodial nature of the center.

[10]*But cf. Schieber v. City of Philadelphia*, 320 F.3d 409 (3d Cir. 2003) (single-judge opinion discussing *Ziccardi* in the context of a state-created danger claim).

[11]We did not explicitly adopt the *Ziccardi* standard in *Rivas*. In fact, it is not altogether clear which standard was applied. For example, at one point after discussing *Ziccardi*, the opinion refers to the only proper test as whether the technicians consciously disregarded "a substantial risk." *Rivas*, 365 F.3d at 196. That would indicate use of the deliberate indifference standard. However, given that the opinion speaks deferentially of *Ziccardi*, and that the culpability question is later summarized in terms of a "great risk of harm," *id.* at 196, we believe that *Ziccardi* was probably meant to apply.

15

*I*, 318 F.3d at 509; *Herrera v. Collins*, 506 U.S. 390, 428 (1993) (Scalia, J., dissenting) (questioning "the usefulness of 'conscience shocking' as a legal test")). We also stated that "[o]ur . . . decisions have not clarified this [second] element of the test to any great extent." *Id.* at 153. For example, we recognized that the definition applied in *Smith I* was "somewhat circular." *Id.*

In addressing the claim before us, we noted and seemed to apply our decision in *Ziccardi*, and stated in a footnote that the standard articulated there was "useful." *Id.* at 154 n.10. However, we also stated that the *Ziccardi* opinion did not deal with the question whether the standard formulated applied to state-created danger claims. *Id.* at 154.

ii.     *Conclusion on the Standard of Culpability*

From the cases discussed above, we gather the following. The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. In a "hyperpressurized environment," an intent to cause harm is usually required. On the other hand, in cases where deliberation is possible and officials have the time to make "unhurried judgments," deliberate indifference is sufficient.[12] Though we need not decide the issue here, we note the possibility that deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known.[13] We also recognize that

---

[12]In *Lewis*, the Supreme Court specified that deliberation need not be viewed in the "narrow, technical sense" often adopted by traditional homicide law. 523 U.S. at 852 n.11. Rather, the Court suggested that deliberation, as required to show deliberate indifference, could take place very quickly. *Id.*

[13]We leave to another day the question whether actual knowledge is required to meet the culpability requirement in state-created danger cases. On the one hand, the Supreme Court has held that actual subjective knowledge of a risk is required for at least some Eighth Amendment claims. *See Farmer v. Brennan*, 511 U.S. at 829. However, the Court has also held that the "obviousness" of a risk can be sufficient for liability in other cases. *See Bd. of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 410-12 (1997) (obviousness sufficient in decision-to-hire cases);

there are circumstances involving something less urgent than a "split-second" decision but more urgent than an "unhurried judgment." Generally, this category will include situations in which the state actor is required to act "in a matter of hours or minutes." *See Ziccardi*, 288 F.3d at 65. In other words, these are situations in which there is some urgency and only "hurried deliberation" is practical. For these circumstances, we utilize the standard set forth in *Miller* and reiterated in the explicit context of state-created danger in *Smith I*. However, we believe that "gross negligence or

---

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (obviousness sufficient in failure-to-train claims).

      The Third Circuit has since stated that generally, a municipality may be held liable for a constitutional violation arising from a policy or custom if it demonstrates indifference to a known or *obvious* consequence. *See, e.g.*, *A.M.*, 372 F.3d at 580. But we have not addressed the question as it relates to underlying state-created danger claims. There is currently a divide among the circuits on this issue. Some courts have concluded that the more expansive objective definition of deliberate indifference utilized in *Brown* and *Harris* extends to state-created danger claims or Fourteenth Amendment substantive due process cases generally. *See, e.g.*, *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) (stating that a state official must "act[] with deliberate indifference to the known or obvious danger") (citation omitted); *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) ("[W]e have articulated the test for deliberate indifference for Fourteenth Amendment purposes to be 'a conscious disregard of known or obvious dangers.'") (citations omitted); *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) ("[A] plaintiff must demonstrate that . . . the risk was obvious or known . . . [and] defendants acted recklessly in conscious disregard of that risk . . . .") (internal quotation marks and citation omitted). In contrast, the Sixth Circuit, for example, has utilized a purely subjective standard. *See, e.g.*, *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006) (noting that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference") (internal quotation marks and citation omitted). Again, we need not decide this question here as there is no dispute that Stiles was subjectively aware of a risk that Michael might be suicidal.

arbitrariness that indeed 'shocks the conscience'" is a standard that provides little guidance. Therefore, we will incorporate the *Ziccardi* test, which is an interpretation of *Miller*, insofar as it requires that the defendants disregard a great risk of serious harm rather than a substantial risk.[14]

In conclusion, we hold that in a state-created danger case, when a state actor is not confronted with a "hyperpressurized environment" but nonetheless does not have the luxury of proceeding in a deliberate fashion, the relevant question is whether the officer consciously disregarded a great risk of harm. Again, it is possible that actual knowledge of the risk may not be necessary where the risk is "obvious."[15]

### iii. *Application of the Standard of Culpability*

The District Court concluded that the deliberate indifference standard applied, but like many other courts to examine this difficult area of the law, it incorrectly differentiated between a "shocks the conscience standard" on the one hand and a "deliberate indifference standard" on the other. For example, the Court suggested that the *Lewis* standard does not apply in non-urgent situations. We again clarify that in *any* state-created danger case,

_____

[14]At this juncture, we need not decide upon the "seriousness" of harm that is required, and see no need to comment on this question.

[15]We recognize that in some instances these standards may become arduous to apply. Other circuits have taken a more straightforward approach to the fault requirement. For example, the Ninth Circuit has held that "deliberate indifference to [a] known or obvious danger" is the uniform standard in all state-created danger cases. *See Kennedy*, 439 F.3d at 1062 (alteration in original) (*citing L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). The Sixth and Eighth Circuits have suggested a two-tiered standard under which deliberate indifference will apply if an opportunity for reflection exists while intent to harm will apply to "split-second decision[s]." *See McQueen*, 433 F.3d at 469; *Hart v. City of Little Rock*, 432 F.3d 801, 806 (8th Cir. 2005). However, unlike these courts, we are constrained by *Miller* and subsequent cases to recognize our three existing tests to identify conscience-shocking behavior.

the state actor's behavior must *always* shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible. In some circumstances, deliberate indifference will be sufficient. In others, it will not.

In finding that the deliberate indifference standard applied, the District Court noted that Stiles "had an entire week – and another visit from Michael Sanford – to reconsider her [initial] evaluation." We agree that at least some forethought about Michael's condition was possible. Certainly, the intent to harm requirement utilized in *Lewis* does not apply. We also find this case distinguishable from *Miller* to the extent that there was probably no "need for [Stiles] to act in a matter of hours or minutes." *Ziccardi*, 288 F.3d at 65. But regardless of whether deliberate indifference, or something more, is required to show that Stiles' conduct shocked the conscience, Sanford is unable to meet her burden. Mere negligence is not enough to shock the conscience. *See Schieber*, 320 F.3d at 419. Thus, the relevant question is *not* whether Stiles *should have* contacted the school psychologist or Michael's parent. Instead, the question is whether, under the circumstances, Stiles' decisions shock the conscience. We hold that, applying either the deliberate indifference standard or the heightened standard we articulated above, they do not.

First, we examine the apparent gravity of the risk. As the District Court noted, "no one," including Michael's mother, Karen, or Michael's uncle, believed that Michael was at risk of harm. Karen indicated several times that she did not believe that Michael would actually commit suicide. For example, she stated: "I was shocked by the fact that he said he wanted to go kill himself. But, of course, I didn't think by the context of it that he was serious." (App. 410.) Karen had never heard Michael talk about hurting himself before and she concluded that he was "not being serious" since "it just seem[ed] like one of those things that you would say" and because Michael joked in the note. (App. 410, 460-61.)

We also do not believe that the language in the note itself was a clear cry for help. Karen testified that the expression "I want[] to kill myself" was used "all the time" by her friends. (App. 461.) Karen was also told by Valladares that the guidance office "get[s] notes like this all the time." (App. 424.) Significantly, the

19

note also referred to any suicidal thoughts as occurring in the past.

Second, Stiles cannot be said to have "disregarded" any risk that Michael presented. She did not simply ignore the note. To the contrary, she promptly spoke with Michael, at which point she made a "conscious judgment" that he indicated no suicidal signs. (*See, e.g.*, App. 421.) This judgment was influenced by the fact that Michael assured Stiles that he was no longer upset about the issue with Karen and that he had future plans. (App. 256, 280.) For these reasons, we cannot conclude that Stiles' conduct shocked the conscience. The evidence adduced by Sanford, even when all inferences are drawn in her favor, falls short of both the standard we have borrowed from *Ziccardi* and the deliberate indifference standard.

### B.    *Prong Four: Did Stiles Create A Danger?*

Given that Sanford has failed to show that Stiles demonstrated the requisite level of fault, her claim can go no further. However, we note that Sanford has also failed to create a question of fact as to the fourth prong of the state-created danger test. Given our opinion in *Bright*, we ask if Stiles used her authority "in a way that created a danger" to Michael or that "rendered [him] more vulnerable to danger than had [she] not acted at all." *Bright*, 443 F.3d at 281.

Sanford alleges eleven "specific affirmative acts" on the part of Stiles. (Appellant's Br. at 25-26.) For example, she alleges that Stiles (1) "Interject[ed] herself into Michael's mental status," (2) "Cut[] Michael off from other sources of aid," (3) "Question[ed] Michael in a manner that pushed him toward suicide," (4) "Misdiagnos[ed] Michael's psychological condition," (4) "Intentionally decid[ed] not to refer Michael to the school psychologist," (5) "Intentionally decid[ed] not to contact Michael's parent," and (6) "Refus[ed] Michael's request to reveal the identify of the person who had turned in the note." (*Id.*)

We agree with the District Court that "[i]n this case, the link between the Defendants' conduct and Michael Sanford's untimely death is far too attenuated to justify imposition of liability." We reach this decision based on several considerations. First, as the District Court noted, Michael visited Stiles on only two occasions

20

– once when she initially called him into her office and again when Michael asked her who she had received the note from. There is no evidence that Michael was agitated by these meetings, or that they contributed in any way to his suicidal feelings.

Second, contrary to Sanford's contentions, there is nothing in the record to suggest that Michael relied on Stiles for support or guidance. The primary encounter between Stiles and Michael was initiated by Stiles, and Michael repeatedly indicated that nothing was troubling him. Finally, Stiles did not in any way interfere with Sanford's parental relationship with her son. She did not, for example, suggest that Michael not speak with his mother. Sanford's choice not to intervene, for example, once she had seen Michael's instant messages referring to suicide, was not influenced by Stiles.

As the District Court noted, Sanford has attempted to "recharacterize" Stiles' failures as "affirmative actions." We believe that this case is more about Stiles' failure to *prevent* Sanford's death. As we have stated many times, "mere failure to protect an individual . . . does not violate the Due Process Clause." *Id.* at 284 (citing *DeShaney*, 489 U.S. at 197) (internal quotation marks omitted).

### *III. Related Case Law*

Our holding that Sanford has failed to make out a state-created danger claim is consistent with the case law of other circuits that have addressed similar cases involving student suicides. In fact, we are aware of only one such instance in which a state-created danger case against school officials survived summary judgment.

Sanford argues that this case is analogous to *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998), in which the Tenth Circuit found sufficient evidence for the plaintiff to survive summary judgment in a state-created danger claim against certain school officials. However, *Armijo* presented a far more compelling case. There, a sixteen-year-old special education student committed suicide after he was suspended from school. *Id.* at 1256-57. He was driven home in the middle of the day, while angry. *Id.* at 1257. Armijo's parents were not notified and the boy was left to remain alone at home, in contravention of school policy.

*Id.* Additionally, school officials were aware that Armijo had access to firearms at home, *id.* at 1264, and that he had previously threatened suicide. For example, Armijo had said to a school aid: "I'm just going to shoot myself" and "maybe I'd be better off dead." *Id.* at 1256. *Armijo* is a far cry from this case because there was much more evidence there that school officials actually created the danger to Armijo.

This case is more properly analogized to *Wyke v. Polk County School Board*, 129 F.3d 560 (11th Cir. 1997). Like this case, *Wyke* focuses on a failure to intervene. A thirteen-year-old boy named Shawn committed suicide at home after twice attempting suicide at school. *Id.* at 563. School officials were "somewhat aware" of these incidents but failed to hold Shawn in custody, contact his mother, or provide him with counseling services. *Id.* Another boy who was aware of Shawn's first suicide attempt alerted his own mother, who in turn notified the school's dean of students. *Id.* at 564. The dean made the assurance that "he would take care of it" but only read Shawn some verses from the Bible. *Id.* The mother who reported the incident to the dean testified that she would have contacted Shawn's mother directly had she known that the dean would not intervene in a more meaningful way. *Id.* at 570.

The Eleventh Circuit concluded that Shawn's mother's claim failed as a matter of law because nothing in the Due Process Clause required that school officers protect Shawn's life. *Id.* at 569. The school did not make a decision to prevent anyone from helping Shawn and it could not be held liable. *Id.* While we do not express agreement or disagreement with the Eleventh Circuit's holding, we note that, like *Armijo*, *Wyke* presented much more urgent circumstances than those we review here. Still, Wyke's claim failed.

The First and Seventh Circuits have also denied claims involving similar or more pressing risks than those we confront here. In *Hasenfus v. LaJeunesse*, 175 F.3d 68 (1st Cir. 1999), the First Circuit rejected parents' Due Process claim after their daughter attempted suicide on school grounds. The child, a known rape victim, attempted suicide after being reprimanded in front of her schoolmates by a teacher. *Id.* at 73. Seven other students in the girl's middle school had attempted suicide in the three months

prior. *Id.* at 70. In affirming the district court, the First Circuit stated:

> The federal courts have no general authority to decide when school administrators should introduce suicide prevention programs, or whether an unruly or upset school child should be sent out of class, or what should be said to other parents about a tragic incident at school. Substantive due process is not a license for judges to supersede the decisions of local officials and elected legislators on such matters.

*Id.* at 74.

Finally, in *Martin v. Shawano-Gresham School District*, 295 F.3d 701, 704 (7th Cir. 2002), a seventh grade student committed suicide after she was suspended for possessing a cigarette on school property. The student, Timijane, went home "crying pretty hard." *Id.* It was later discovered that she had shown some signs of suicide risk – for example, she had a book in her locker called "After a Suicide," and there had been other suicide attempts at the school. *Id.* at 704, 710. The Seventh Circuit refused Timijane's parents' claim, holding that "[b]ecause the defendants did not create or increase a risk that Timijane would commit suicide . . . the . . . substantive due process claim must fail." *Id.* at 712.

Given this case law, we are confident that we have reached the correct decision in this case.

### IV.  Qualified Immunity

Because we find that no constitutional right was violated, we need not address the question whether Stiles was entitled to qualified immunity in the federal claim. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### V.  Liability of the East Penn School District

Sanford advances a claim of municipal liability against the East Penn School District. She argues that the School District is

liable for damages because Stiles' actions were taken pursuant to school policy. For example, Sanford alleges that the District's counselors are not adequately prepared to make an initial assessment of a student's suicide risk.[16] (Appellant's Br. at 37.) The District Court dismissed the municipal liability claim on summary judgment.

There is no respondeat superior theory of municipal liability, so a city may not be held vicariously liable under § 1983 for the actions of its agents. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality may be held liable only if its policy or custom is the "moving force" behind a constitutional violation. *See Brown*, 520 U.S. at 400; *see also Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) (stating that a municipality is only liable when the municipality itself is the "wrongdoer"). In *Brown v. Pennsylvania Department of Health Emergency Medical Services Training Institute*, 318 F.3d at 482, we held that it is possible for a municipality to be held independently liable for a substantive due process violation even when none of its individual employees is liable. However, we emphasized that in order for municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights. *Id.* (citing *Collins*, 503 U.S. at 122). Here, there was none.

We assume arguendo that the School District's Suicide Referral Process constitutes a "policy" or "custom" of the District.[17] Still, in order to prove that a violation occurred, Sanford must show a "direct causal link" between the policy and a constitutional violation. *Id.* Additionally, to meet the standard of fault, Sanford must show that the municipality acted with "deliberate indifference" toward the rights of its students. *Id.* at 479 ("[T]he [Supreme] Court has instructed that 'deliberate indifference' is the necessary standard in order to establish § 1983

---

[16]As the District Court noted, Sanford did not explicitly pursue a "failure to train" claim.

[17]"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (internal quotation marks and citation omitted).

liability of a municipality.") (citation omitted); *see also Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004); *Berg*, 219 F.3d at 276.

In our view, Sanford has not made either showing. She has failed to cite any evidence that Michael's reasons for taking his own life were related to Stiles' "intervention," which was undertaken in accordance with school policy. Therefore, no policy can be said to have caused Michael's death. Sanford has also failed to create a genuine issue of material fact as to whether the School District "disregarded a known or obvious consequence of [its] action." *Brown*, 520 U.S. at 410. For example, as the District Court noted, there is no evidence of a pattern of student suicides in the district. Nor is there evidence that the policy had failed in the past. Hence, we find no reason to overturn the District Court's judgment with respect to Sanford's claim of municipal liability.

### *VI. Sanford's State Law Negligence Claim*

We now turn to Sanford's allegation that Stiles is liable for negligence under Pennsylvania law. The District Court determined that Sanford's state claim failed for lack of causation. Specifically, it stated that Sanford "has not presented evidence that Pamela Stiles caused Michael Sanford to kill himself." Additionally, the District Court found that Stiles is entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act ("PPSTCA"). We agree and affirm on this point.

Under the PPSTCA, local agencies such as school districts are given broad tort immunity. The Act provides that, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. § 8541. There are eight "acts" excepted from the immunity granted under § 8541, but none applies here. *See* 42 Pa. Cons. Stat. § 8542.[18]

---

[18]Liability can be imposed for (1) the operation of a motor vehicle in the possession or control of a local agency; (2) the care, custody or control of personal property in the possession or control of a local agency; (3) the care, custody or control of real property; (4) a dangerous condition created by trees, traffic controls, or street lights; (5) a dangerous condition of utility service facilities; (6) a

Municipal *employees*, including school district employees, are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment. 42 Pa. Cons. Stat. § 8545. However, there is an exception to this general rule: Employees are not immune from liability under § 8545 where their conduct amounts to "actual malice" or "willful misconduct":

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, *actual malice or willful misconduct*, the provisions of section[] 8545 . . . shall not apply.

42 Pa. Cons. Stat. § 8550 (emphasis added).

There are no allegations of actual malice here. And, as the Pennsylvania Supreme Court has recognized, willful misconduct is a demanding level of fault. Willful misconduct has been defined by the Pennsylvania Supreme Court as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (citations omitted). Otherwise stated, "the term 'willful misconduct' is synonymous with the term 'intentional tort.'" *Id.* (citation omitted); *see also Bright*, 443 F.3d at 287; *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001). For the same reasons stated earlier in this opinion, we do not believe that a reasonable jury could conclude that Stiles engaged in "willful misconduct." Therefore, she is entitled to immunity under Pennsylvania law.

## *VII. Conclusion*

For the foregoing reasons, we believe that Sanford's federal and state claims must fail. She has failed to meet the necessary

---

dangerous condition of streets; (7) a dangerous condition of sidewalks; (8) the care, custody or control of animals in the possession or control of a local agency. 42 Pa. Cons. Stat. § 8542.

elements for a state-created danger claim under Third Circuit law. Specifically, there is no genuine issue of material fact as to the requisite level of culpability or as to whether Stiles or the East Penn School District created or enhanced the danger that Michael would commit suicide. Furthermore, Stiles is entitled to immunity under Pennsylvania state law. We will therefore affirm.