PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2074
_____

NICOLE HABERLE, In her own right, on behalf of her two
minor children, and as administrator of the
Estate of Timothy Nixon, deceased

Nicole Haberle,
Appellant

v.

OFFICER DANIEL TROXELL, Individually, and in his
official capacity as Nazareth Borough Police Officer;
THOMAS TRACHTA, Individually, and in his official
capacity as Nazareth Borough Police Chief;
MAYOR CARL STYRE, Individually, and in his official
capacity as Mayor of Nazareth Borough;
PRESIDENT DAN CHIAVAROLI, Individually, and in his
official capacity as President of Nazareth Borough Council;
VICE PRESIDENT LARRY STOUDT, Individually, and in
his official capacity as Vice President of Nazareth Borough
Council; JOHN SAMUS, Individually, and in his official
capacity as a member of Nazareth Borough Council;
COUNCIL MEMBER MICHAEL KOPACH, Individually,
and in his offical capacity as a member of Nazareth Borough
Council; COUNCIL MEMBER FRANK MAUREK,
Individually, and in his official capacity as a member of

Nazareth Borough Council; COUNCIL MEMBER
CHARLES DONELLO, Individually, and in his official
capacity as a  Member of Nazareth Borough Council;
COUNCIL MEMBER CARL FISCHL, Individually, and in
his official capacity as a member of Nazareth Borough
Council; JOHN/JANE DOE POLICE STAFF #1-X,
Individually, and in their official capacities as staff of the
Nazareth Police Department; BOROUGH OF NAZARETH

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 5-15-cv-02804)
District Judge:  Hon. Joseph F. Leeson, Jr.
_____

Argued: November 4, 2016

Before:   JORDAN, GREENAWAY, JR., and RENDELL,
*Circuit Judges*.

(Opinion Filed: March 20, 2018)

_____

Joseph E. Welsh   [ARGUED]
Lauer & Fulmer
701 Washington St.
Easton, PA   18042
    *Counsel for Appellant*

Rufus A. Jennings
John P. Morgenstern   [ARGUED]
Deasey Mahoney & Valentini
1601 Market Street
Suite 3400
Philadelphia, PA 19103
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*

Timothy Nixon was a troubled man.  After stealing a firearm, he told his partner, Nicole Haberle, that he was going to commit suicide.  When a police officer employed by the Borough of Nazareth learned of that threat, he did not wait for trained crisis support professionals but instead knocked on the door of the apartment where Nixon was located and announced his presence.  Nixon immediately shot himself.

Ms. Haberle has sued, on her own behalf and also as the administrator of Nixon's estate, claiming that that police officer – Daniel Troxell – and other law enforcement officers, and the Borough, violated the Constitution as well as a variety of federal and state statutes.  All of her claims were dismissed by the District Court, and she now appeals.  Her primary argument is that Troxell unconstitutionally seized Nixon and that Nixon's suicide was the foreseeable result of a danger that Troxell created.  She also argues that the Borough violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101-213 (the "ADA"), by, among other things, failing to

3

modify Borough policies, practices, and procedures to ensure that disabled individuals would have their needs met during interactions with the police. Although we recognize the grief borne by those who cared deeply for Mr. Nixon, we are nonetheless persuaded that the District Court was largely correct in its disposition of this case. But, because we conclude that Ms. Haberle should be given an opportunity to amend her complaint with respect to her ADA claim, we will affirm in part and vacate in part the District Court's rulings, and remand for further proceedings.

## I. BACKGROUND[1]

Timothy Nixon suffered from a variety of mental health problems, including depression. For years, he had lived off and on with his long-time partner, Ms. Haberle, and their two children. On May 20, 2013, he had "a serious mental health episode involving severe depression." (Opening Br. at 6.) He called Haberle and told her that he was suicidal, and then broke into a friend's home and took a handgun. He next went to his cousin's apartment.

Fearing for Nixon's life, Haberle contacted the Borough of Nazareth Police Department. Officer Daniel Troxell obtained a warrant for Nixon's arrest, and, having learned that Nixon was still at his cousin's apartment, Troxell

---

[1] When reviewing a decision to grant a motion to dismiss, we "accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 193 n.5 (3d Cir. 2013).

4

went there, accompanied by other officers from the Borough and surrounding municipalities.[2] Upon arriving at the apartment, some of the officers suggested setting up a perimeter and asking the Pennsylvania State Police to send crisis negotiators. Others suggested asking Haberle to help communicate with Nixon. Troxell rebuffed those suggestions, calling the other officers "a bunch of f[---]ing pussies." (App. at 7.) He declared his intention to immediately go to the apartment, because "[t]his is how we do things in Nazareth." (App. at 7.) He did as he said, knocked on the door of the apartment, and identified himself as a police officer. Nixon then promptly went into one of the bedrooms of the apartment and turned the stolen gun on himself.

Following the suicide, Haberle sued Troxell, the other officers who were at the scene, the chief of police of Nazareth, the Mayor of Nazareth, and various members of the Borough Council, including the President and Vice-President, and the Borough of Nazareth itself. Her complaint, as amended, included eleven counts.[3] The Defendants moved

---

[2] According to Haberle, Nixon was not a danger to anyone and was peacefully drinking beer with his cousin. She does not, however, allege that Troxell knew what was happening inside the apartment.

[3] Haberle had been allowed to amend her complaint under the safe harbor provisions of Federal Rule of Civil Procedure 11(c)(2) to remove some inflammatory rhetoric in the initial pleading. The amended complaint includes claims listed as "[c]ounts." (*See* App. at 81-89.) The first six claims were brought under 42 U.S.C. § 1983. Count one claimed

pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint, and that motion was granted. The District Court did not grant Haberle an opportunity to further amend her complaint, concluding that any additional amendment would be futile. This timely appeal followed.

## II. DISCUSSION[4]

that Troxell had violated the Fourth and Fourteenth Amendments in a variety of ways, including depriving Nixon of his right to bodily integrity, freedom from unreasonable searches and seizures, freedom from state-created dangers, and freedom from arbitrary conduct that shocks the conscience. Count two claimed that all of the officers denied Nixon needed medical care. Count three was against the officers other than Troxell and alleged a failure to intervene to prevent unconstitutional conduct. Count four attempted to hold Troxell's superiors responsible for Troxell's conduct. Count five alleged municipal liability for a failure to train. Count six involved an allegation of civil conspiracy. The seventh count alleged violations of the ADA by the Borough. The remaining counts claimed violations of state law, including intentional infliction of emotional distress, negligent infliction of emotional distress, wrongful death, and a survivorship action for lost revenue and pain and suffering.

[4] The District Court had jurisdiction over Haberle's federal claims under 28 U.S.C. §§ 1331 and 1343. It had supplemental jurisdiction over her state law claims under 28 U.S.C. § 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the District Court's dismissal order is *de novo*. *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 230 (3d Cir. 2008).

6

Haberle focuses on three arguments – two under provisions of the Constitution and one under the Americans with Disabilities Act. Specifically, she alleges that dismissal of her claims against Troxell was improper because Troxell's actions amounted to an unconstitutional seizure in violation of the Fourth Amendment. She also claims that Troxell's actions constituted a "state-created danger" in violation of the

---

Haberle has standing to bring her § 1983 claims on behalf of Nixon as the administrator of his estate. *Giles v. Campbell*, 698 F.3d 153, 156 (3d Cir. 2012) (explaining that the survival of claims is determined by reference to "the common law, as modified and changed by the constitution and statutes of the [forum] State," unless inconsistent with federal law, and that "'the survival of civil rights of actions under § 1983 upon the death of either the plaintiff or defendant' was an area not covered by federal law" (alteration in original) (quoting *Robertson v. Wegmann*, 436 U.S. 584, 588 (1978))); *see also* 42 Pa. Cons. Stat. Ann. § 8302 ("All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."). Haberle likewise has standing to bring the ADA claim even after Nixon's death – either under federal common law or based on Pennsylvania law. *Compare Guenther v. Griffin Constr. Co., Inc.*, 846 F.3d 979, 982 (8th Cir. 2017) (concluding that an ADA claim survives the death of an injured party under federal common law), *with Slade for Estate of Slade v. U.S. Postal Serv.*, 952 F.2d 357, 360 (10th Cir. 1991) (applying state law to determine that a survivorship claim was permissible under the ADA).

Due Process Clause of the Fourteenth Amendment.[5]  Finally, she argues that the Borough violated the ADA.  None of those arguments is persuasive.

### A.    Troxell's Actions Did Not Constitute an Improper Seizure

Police are entitled to "knock and talk" with people in a residence, and doing so is not a seizure under the Fourth Amendment.  *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003) (citing *Rogers v. Pendleton*, 249 F.3d 279, 289-90 (4th Cir. 2001)).  In order to effectuate a seizure, there must be something more than "inoffensive contact between a member of the public and the police … ."  *United States v. Mendenhall*, 446 U.S. 544, 555 (1980).  There must be, for instance, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, … the use of language or tone of voice indicating that compliance with the officer's request might be compelled," or some other communication that would convey to a reasonable person that compliance was not optional.  *Id.* at 554.  "[T]he subjective intention of the [officers] … is irrelevant except insofar as that may have been conveyed to the respondent."  *Id.* at 554 n.6.

In this case, the District Court correctly concluded that there was no seizure.  Whether or not well-advised, and

---

[5] A "state-created danger" may exist where a state actor either creates a harmful situation or increases a citizen's exposure or vulnerability to an already-present danger.  *See Bright v. Westmoreland Cty.*, 443 F.3d 276, 281-82 (3d Cir. 2006) (discussing the state-created danger doctrine).

despite his crudely expressed intentions, Troxell merely knocked on the door and announced his presence. That alone is not enough to violate the Fourth Amendment. There is no allegation that Troxell made intimidating remarks to Nixon or announced his presence in a threatening fashion. Nor is there any allegation that Nixon was aware of the warrant or of the other officers that were outside of the apartment complex. The complaint gives no reason to believe that Nixon felt he was "not free to leave," *id.* at 554, or that he was unable to "decline the [officer's] requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). Because Nixon's liberty was not restricted, there was no seizure. *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 171 (1st Cir. 2008) ("Given the Estate's failure to establish [the decedent's] knowledge of the [police] perimeter, no reasonable factfinder could find that a person in [the decedent's] circumstances would have thought that the perimeter restricted his liberty to leave the ... residence.").

In any event, Troxell acted under color of a warrant, and Haberle does not argue that the warrant was invalid or was obtained under false pretenses or would have resulted in a false arrest. Even if a seizure had occurred, then, it would not have been unlawful. *See Berg v. Cty. of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000) (explaining that an officer is immune from suit after an arrest based on a warrant, if there is a reasonable belief that the warrant is valid).

### B.     Troxell's Actions Did Not Cause a State-Created Danger

As a general principle, the government has no obligation under the Due Process Clause of the Fourteenth

Amendment to protect citizens against injuries caused by private actors. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989). That includes a self-inflicted injury. *Sanford v. Stiles*, 456 F.3d 298, 303-04 (3d Cir. 2006). There is, however, an obligation to protect individuals against dangers that the government itself creates. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006). We have identified four elements for a claim under the "state-created danger" doctrine:

> (1) [T]he harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (citations, footnotes, and internal quotation marks omitted). The District Court here considered the second element in particular and determined that Officer Troxell's

10

conduct lacked "a degree of culpability that shocks the conscience." *Id*. We agree with that assessment.[6]

For behavior by a government officer to shock the conscience, it must be more egregious than "negligently inflicted harm," as mere negligence "is categorically beneath the threshold of constitutional due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Instead, "only the most egregious official conduct can be said to" meet that standard. *Id.* at 846.

The required degree of culpability varies based on the "the circumstances of each case," and, in particular, on the time pressure under "which the government actor[] had to respond … ." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 240 (3d Cir. 2008). Split-second decisions taking place in a "hyperpressurized environment," usually do not shock the conscience unless they are done with "an intent to cause harm." *Sanford*, 456 F.3d at 309. At the other end of the continuum, actions taken after time for "unhurried judgments" and careful deliberation may shock the conscience if done with deliberate indifference. *Id.* (quoting *Lewis*, 523 U.S. at 853). In the middle are actions taken under "hurried deliberation." *Id.* at 310. Such situations involve decisions that need to be made "in a matter of hours

---

[6] Because Troxell's conduct does not shock the conscience, we do not address the other prongs of the "state-created danger" doctrine. Before the District Court and again on appeal, Troxell argued that the "state-created danger" claim against him should be barred by qualified immunity. The District Court did not address qualified immunity, and, given our disposition of the claim, neither do we.

or minutes." *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 65 (3d Cir. 2002). If that standard applies, then an officer's actions may shock the conscience if they reveal a conscious disregard of "a great risk of serious harm rather than a substantial risk." *Sanford*, 456 F.3d at 310.

Not surprisingly, Troxell urges us to adopt the split-second standard, while Haberle presses for the unhurried judgment standard. The District Court applied the intermediate standard – the one for situations involving "hurried deliberation," *id.* at 309, and that was correct. Nixon had expressed suicidal tendencies and had stolen a deadly weapon. There was not time for casual deliberation. On the other hand, a few hours had passed since Nixon stole the gun and there was no indication that the situation was escalating or otherwise required instantaneous action by Troxell. Therefore, the District Court properly applied the intermediate standard and asked whether Troxell's actions showed conscious disregard of a great risk of harm to Nixon.

The decision Troxell made to ignore the advice of other officers and knock on the apartment door falls beneath the threshold of conscious disregard. Haberle describes Troxell's actions as "Ramboesque vigilantism," (Opening Br. at 24), but the fact that Troxell chose to immediately knock while other officers counseled waiting manifests only a disagreement over how to manage a risk, not a disregard of it. As the District Court noted, "[u]nder the circumstances that the officers were confronting, any decision they could have made … was not free from risk to Nixon, the other occupants of the apartment, or the officers." (App. at 16-17.) Nixon's suicide is surely tragic, and, in its aftermath "it is natural to

12

second-guess the decisions of Troxell," (App. at 17), but we cannot say that what he did shocks the conscience.

### C. Haberle Has Not Pled a Compensable Claim Under the ADA

The final issue on appeal involves Haberle's claim that the Borough violated the ADA. She argues that she is entitled to money damages because the Borough "fail[ed] to make reasonable modifications to [its] policies, practices and procedures to ensure that [Nixon's] needs as an individual with a disability would be met." (App. at 87.) While we agree that, in general, the ADA applies to arrest situations, Haberle fails to state a claim for damages under that statute because she does not allege facts showing that any inaction of the Borough reflects deliberate indifference.

#### 1. The ADA Generally Applies When Police Officers Make an Arrest

As a threshold matter, we consider whether the ADA applies when police officers make an arrest. Although the question is debatable, we think the answer is generally yes.[7]

---

[7] According to Haberle, even if her ADA claim against the Borough was meritless at the point of arrest, it should still survive because the Borough's failure to establish a suitable training program is, by itself, a violation of the ADA. To support her theory, Haberle points to an opinion from the United States District Court for the Middle District of Pennsylvania, *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232 (M.D. Pa. 2003). In *Schorr*, the court concluded that whether there was an ADA claim on the day of the arrest was

13

Our analysis begins with the statutory text. *See Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("Statutory interpretation, as we always say, begins with the text … ."). To successfully state a claim under Title II of the ADA, a person "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Bowers v. Nat'l*

---

"irrelevant" because the purported injury did not occur the day of the police altercation but instead "occurred well before that day, when the … policy makers failed to institute [policies] to accommodate disabled individuals … by giving the officers the tools and resources to handle the situation peacefully." *Id.* at 238.

    *Schorr* is a thoughtful effort to address difficult issues but, ultimately, its reasoning misses the mark because it is incompatible with the text of the ADA. As the District Court here correctly observed, an ADA violation occurs if and when a disabled individual is "excluded from participation in" or "denied the benefits of the services, programs, or activities of a public entity" or is "subjected to discrimination by any such entity." (App. at 28 n.20 (quoting 42 U.S.C. § 12132).) A municipality's failure to train its police is not actionable unless and until that failure leads directly to a denial of a needed accommodation or improper discrimination. It is the denial that gives rise to the claim. Thus, contrary to the assertion in *Schorr* that ADA deprivations could occur before the day of the problematic incident between the citizen and the police, it is the incident itself that must be the focus of attention.

*Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007).[8]  The first question, then, is whether arrestees can be "qualified individuals" under the ADA, and the best response is that they can, for there is nothing to categorically exclude them from the statute's broad coverage.[9]  *See Gorman v.*

---

[8] The language of the statute itself is, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

[9] That arrestees can qualify does not, of course, mean that they necessarily will qualify.  There remains a question whether a potentially violent person with mental health problems who, while possessing a gun, barricades himself in another person's apartment is a "qualified individual" under the ADA.  The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  We have previously noted that a "significant risk test" has been used to determine whether an individual is qualified to receive protection under the analogous Rehabilitation Act.  *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 303 (3d Cir. 2007).  Whether application of that same test in the ADA context is appropriate, however, is not

*Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998) (concluding that an arrestee could be a qualified individual under the ADA despite not having "'volunteered' to be arrested"); *cf. Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-11 (1998) (noting that a state prisoner could be a "qualified individual" under the ADA even when participation in a service, program, or activity of the State is not voluntary).

The second question is whether arrestees may have disabilities covered by the ADA, and the answer to that is clearly "yes." *See* 42 U.S.C. § 12102(1) (defining "disability" for purposes of the ADA). Like the overall population, the subset of people who violate the law, or are suspected of such, will naturally include those with recognized disabilities. The dragnet, so to speak, gathers of every kind.

Saving the third qualifying question for last, we next note that the fourth requirement, that the claimant has been excluded from a service, program, or activity or discriminated against by reason of his disability, is also one that can be satisfied in the context of an arrest. If the arrestee's "disability 'played a role in the … decisionmaking process and … had a determinative effect on the outcome of that process[,]'" *i.e.,* if the arrestee's disability was a "but for" cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met. *See CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007)).

---

something that we need to address now. We reserve judgment on that issue for another day.

The most controversial question pertinent to whether the ADA applies when police officers are making arrests comes in the context of the statute's third requirement. We must consider whether arrests made by police officers are "services, programs, or activities of a public entity," or alternatively, whether police officers may be liable under the ADA for "subject[ing a qualified individual] to discrimination" while effectuating an arrest. 42 U.S.C. § 12132.

The text of the ADA is deliberately broad and police departments "fall[] 'squarely within the statutory definition of a "public entity."'" *Gorman*, 152 F.3d at 912 (quoting *Yeskey*, 524 U.S. at 210); *see* 42 U.S.C. § 12131(1)(A)-(B) (defining "public entity" to include, among other things, "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government"); *see also Yeskey*, 524 U.S. at 209-10 (concluding that state prisons are public entities under the ADA because "the ADA plainly covers state institutions …"). Furthermore, persuasive precedent indicates that the ADA's reference to "the services, programs, and activities of a public entity" should likewise be interpreted broadly "to 'encompass[] virtually everything that a public entity does.'" *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (alteration in original) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998)); *see also Yeskey v. Comm. of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997) (noting that similar "broad language" in the ADA's implementing regulations was "intended to appl[y] to anything a public entity does" (alteration in original) (internal quotation marks omitted)), *aff'd*, 524 U.S. 206 (1998). Nevertheless, courts

17

across the country are divided on whether police fieldwork and arrests can rightly be called "services, programs, or activities of a public entity … ." 42 U.S.C. § 12132.[10]

Fortunately, we do not need to resolve that issue in this case, because § 12132 is framed in the alternative and we can look instead to the second phrase, namely, to whether the arrestee was "subjected to discrimination" by the police. *Id.*; *see also Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1084 (11th Cir. 2007) (concluding that the court did not need to decide "whether police conduct during an arrest is a program, service, or activity covered by the ADA" because a plaintiff "could still attempt to show an ADA claim under the final clause in the Title II statute"). The "subjected to discrimination" phrase in Title II is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Bircoll*, 480 F.3d at 1085 (quoting *Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*, 133 F.3d 816, 821-22 (11th Cir. 1998)); *accord Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997), *overruled on other grounds by Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001).

---

[10] The Supreme Court had granted certiorari to address that question, *City & Cty. of San Francisco v. Sheehan*, __ U.S. __, 135 S. Ct. 702 (2014), but it later dismissed the writ as improvidently granted. *City & Cty. of San Francisco v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1773-74 (2015). The issue thus continues to divide some federal courts. *See generally* Robyn Levin, Note, *Responsiveness to Difference: ADA Accommodations in the Course of an Arrest*, 69 Stan. L. Rev. 269 (2017) (compiling cases).

18

Moreover, we have said that "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). It follows, then, that police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability, thus subjecting him to discrimination. Given that catchall, we believe that the ADA can indeed apply to police conduct during an arrest.

That conclusion, which is suggested by the wide scope of the ADA's text, has support from our sister circuits. *See, e.g.*, *Sheehan*, 743 F.3d at 1217 ("Title II of the [ADA] applies to arrests."); *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013) ("[T]he ADA … appl[ies] to law enforcement officers taking disabled suspects into custody."). Even though there is some disagreement concerning the point during a law enforcement encounter at which the ADA applies to police conduct, no court of appeals has held that the ADA does not apply at all. *See, e.g.*, *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) (holding "that Title II does not apply to an officer's on-the-street responses to reported disturbances or other incidents … prior to the officer's securing the scene and ensuring that there is no threat to human life"); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II … is not the law.").[11]

---

[11] A successful ADA claim demands more than an allegation of an arrest of a qualified individual with a disability. The implementing regulations for the ADA make

19

## 2. *Haberle Does Not Allege Deliberate Indifference*

Even though the ADA generally applies in the arrest context, Haberle's claim for money damages against the Borough fails as a matter of law because she has not adequately pled that the Borough acted with deliberate indifference to the risk of an ADA violation. She seeks compensatory damages from the Borough under the ADA, but that remedy is not available absent proof of "intentional discrimination." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013) ("[C]laims for

clear that there must also have been a failure to make reasonable accommodations. *See* 28 C.F.R. § 35.130(b)(7)(i) (stating that public entities are only required to make "*reasonable* modifications in policies, practices, or procedures" to comply with the ADA (emphasis added)); *see also* 42 U.S.C.A. § 12131 (referencing "reasonable modifications to rules, policies, or practices" in defining "qualified individual"); *supra* note 9. The analysis as to what is "reasonable" under the circumstances, including exigent circumstances, and as to how their determination is reached, presents complicated issues. *See* Levin, *supra* note 10. We have no occasion now to consider the analytical approach to an ADA claim arising from an arrest because we conclude that Haberle's ADA claim for money damages fails due to her failure to plead deliberate indifference. Nevertheless, in the future, we may need to consider whether and under what circumstances it is reasonable to require police officers to make accommodations during an arrest when they face an exigent threat.

compensatory damages under … § 202 of the ADA also require a finding of intentional discrimination."). To prove intentional discrimination, an ADA claimant must prove at least deliberate indifference, *id.* at 263, and to plead deliberate indifference, a claimant must allege "(1) knowledge that a federally protected right is substantially likely to be violated … and (2) failure to act despite that knowledge." *Id.* at 265 (emphasis omitted).

Haberle, however, fails to allege that the Borough was aware that its existing policies made it substantially likely that disabled individuals would be denied their federally protected rights under the ADA. She could have met that obligation in two different ways: first, by alleging facts suggesting that the existing policies caused a failure to "adequately respond to a pattern of past occurrences of injuries like the plaintiffs,'" or, second, by alleging facts indicating that she could prove "that the risk of … cognizable harm was 'so great and so obvious that the risk and the failure … to respond will alone' support finding" deliberate indifference. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 136-37 (3d Cir. 2001) (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (in the context of §1983 suits by prison inmates)); *see S.H. ex rel. Durrell*, 729 F.3d at 263 n.23 (noting that the standard for proving deliberate indifference being adopted for the ADA context "is consistent with our standard of deliberate indifference in the context of § 1983 suits by prison inmates").

Haberle's complaint does neither. She relies on general allegations that the Borough has "a history of violating the civil rights of residents[,]" (App. at 76), offering only hazy support for that statement. Even if she could ultimately prove a generalized history of civil rights

21

violations, that would not necessarily demonstrate "a pattern of past occurrences of injuries *like the plaintiff*[*'s*.]" *Beers-Capitol*, 256 F.3d at 136 (emphasis added). Because those other vaguely referenced violations have not been adequately alleged to be "similar to the violation at issue here, they could not have put [the Defendant] on notice" that policies, practices, and procedures had to be changed. *Connick v. Thompson*, 563 U.S. 51, 63 (2011). Nevertheless, with respect to that defect, Haberle should be given an opportunity to amend her complaint, if possible, to salvage her ADA claim against the Borough, since this failure in her complaint is not one as to which we can say definitively that amendment would be futile.[12]

---

[12] Haberle contends that the District Court erred in not granting her leave to amend her complaint again. She did not, however, "request[] leave to amend, nor suggest[] the existence of any allegations not contained in the Amended Complaint." (App. at 3.) On appeal, she has not pointed to any amendments that she would have made to her complaint if given the opportunity to do so. (Opening Br. at 24-25.) And it seems clear that she cannot make any amendment that would save her § 1983 claim, so granting leave to amend would be futile with respect to that claim. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) ("We have held that even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."). But Haberle should be given the narrow opportunity to amend her complaint with respect to her ADA claim, particularly her allegations of a history of civil rights violations by the Borough, because

Haberle also complains that "a set of policies and procedures had been drafted by the Department" which should have guided "interact[ion] with mentally disturbed individuals, and those in crisis situations[,]" but that "the said policies and procedures were not adopted by the Borough Council, nor were they implemented by the Mayor or Police Department." (App. at 78-79.) Yet Haberle does not allege any facts indicating that the policies were drafted because of an awareness that the pre-existing policies were substantially likely to lead to a violation of citizens' rights. Absent such awareness, a municipality cannot be found to be deliberately indifferent merely for considering but not yet adopting new policies or amendments to old ones. To impose liability on that basis would create a perverse deterrent to voluntary reform.

Haberle likewise fails to allege that the risk of harm was "so great and so obvious," as to obviate the need for her to allege facts pertaining to the Borough's knowledge. *Beers-Capitol*, 256 F.3d at 136 (quoting *Sample*, 885 F.2d at 1118). At most, she claims that the Borough's conduct falls "beneath the nationally recognized standards for police department operations" with regard to those with mental illness. (App. at 75.) But, assuming that is true, falling below national standards does not, in and of itself, make the risk of an ADA violation in such circumstances "so patently obvious that a [municipality] could be held liable" without "a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. As the District Court explained, "[t]he failure to train police officers

---

deliberate indifference was not discussed in the District Court as to that claim.

23

to refrain from doing so much as knocking on the door when they receive a call that a mentally ill individual has stolen a firearm, is contemplating suicide, and may be in the presence of others whose status is unknown is not so obvious [a deficiency] that the Borough could be said to have been deliberately indifferent to the need for that training." (App. at 22.)

## III.  CONCLUSION

For the foregoing reasons, we will affirm in part and vacate in part the District Court's dismissal of Haberle's claims, and remand for further proceedings consistent with this opinion.

Greenaway, Jr., *Circuit Judge*, concurring

I join the majority opinion and agree that Title II of the Americans with Disabilities Act (ADA) applies to arrests when the arrestee is "subjected to discrimination" by the police. Maj. Op. at 18 (quoting 42 U.S.C. § 12132). However, I would also hold that—based on the text of Title II, the Department of Justice's interpretations of Title II, and the Supreme Court's holding in *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)— that arrests constitute "services, programs, or activities of a public entity" under the ADA. 42 U.S.C. § 12132.[1]

## I.

As the majority has stated, to successfully state a claim under Title II of the ADA, a plaintiff must, *inter alia*, demonstrate that "[he or she] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, *or* was subjected to discrimination by any such entity." Maj. Op. at 14 (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir.

---

[1] In contrast to *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1084 (11th Cir. 2007)—where the Eleventh Circuit declined to decide "whether police conduct during an arrest is a program, service, or activity covered by the ADA" because a plaintiff "could still attempt to show an ADA claim under the final clause in the Title II statute"—the Fourth Circuit's decision in *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, counsels that the Court should reach both clauses in light of *Yeskey*. 673 F.3d 333, 338 (4th Cir. 2012) ("[I]n light of *Yeskey*'s expansive interpretation, the ADA applies to police interrogations *under either test*." (emphasis added)).

2007)) (emphasis added). However, the majority's holding only allows an arrestee to succeed on an ADA claim if he or she can prove discrimination by a public entity, leaving open the question of whether an arrestee can recover under the ADA for being "denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. This is significant because "[c]ases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996).

In my estimation, the statutory text of the ADA makes clear that arrests can qualify as a "service[], program[], or activit[y]" of the police, and I therefore see no reason to hang a cloud of doubt over an arrestee's right to recovery under this alternate theory. Congress declared that the purpose of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). "[S]ervices, programs, or activities," is a phrase that Congress intended to be construed consistently with its definition in the precursor to the ADA, the Rehabilitation Act of 1973. 42 U.S.C. § 12201(a) (declaring that Title II is not to "be construed to apply a lesser standard than the standards applied under . . . the Rehabilitation Act of 1973"); *see also Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (holding that § 12201(a) "requires [courts] to construe the ADA to grant at least as much protection as provided by . . . the Rehabilitation Act"). Section 504 of the Rehabilitation Act defines "program or activity" to mean "*all* of the operations" of an entity, 29 U.S.C. § 794(b) (emphasis added), and we have recognized that "[t]he statutory definition of '[p]rogram or activity' in Section 504 indicates that the terms were intended to be *all-encompassing*." *Yeskey*

2

*v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997) (alterations in original) (emphasis added), *aff'd sub nom. Yeskey*, 524 U.S. at 213.  Similarly, our sister circuits have also relied on § 504 to construe "services, programs, or activities" broadly for purposes of Title II.

In *Barden v. City of Sacramento*, for example, the Ninth Circuit explained:

> Th[e] broad construction of the phrase, "services, programs, or activities," is supported by the plain language of the Rehabilitation Act . . . The legislative history of the ADA similarly supports construing the language generously, providing that Title II "essentially . . . simply extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act] to *all actions of state and local governments.*" H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (emphasis added); *see also id.* at 151, *reprinted in* 1990 U.S.C.C.A.N. 303, 434 ("Title II . . . makes *all activities* of State and local governments subject to the types of prohibitions against discrimination . . . included in section 504 . . . .") (emphasis added).

292 F.3d 1073, 1076-77 (9th Cir. 2002) (first alteration added); *see also Fortyune v. City of Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014) ("[T]he term 'services, programs, or activities' as used in the ADA is . . . broad, bringing within its scope anything a public entity does." (internal quotation marks omitted)); *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) ("[T]he phrase 'services, programs, and activities,' . . .

'encompass[es] virtually everything that a public entity does.'" (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998))); *Johnson*, 151 F.3d at 570 ("[A] broad reading of 'programs, services, and activities' is consistent with the broad definition used in § 504 of the Rehabilitation Act. *This is significant*, because we look to the Rehabilitation Act for guidance in construing similar provisions in the Americans with Disabilities Act." (emphasis added)). Accordingly, under the clear language of Title II, the terms "services, programs, or activities" regulate arrests independent of the catch-all phrase that prohibits all discrimination by public entities.[2]

## II.

In addition to the plain text, the Department of Justice's interpretations of Title II also provide that arrests are "services, programs, or activities of a public entity" under the ADA. 42 U.S.C. § 12132. Pursuant to its authority to "promulgate regulations" and "render technical assistance" to assist public

---

[2] The Supreme Court has cautioned that the open-endedness of "services, programs, or activities" should not be confused for ambiguity. *See Yeskey*, 524 U.S. at 212 ("As we have said before, the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotation marks omitted)); *see also In re Phila. Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010) ("In employing intentionally broad language, Congress avoids the necessity of spelling out in advance every contingency to which a statute could apply.").

4

entities in complying with the ADA, the Department of Justice has interpreted Title II to apply to law enforcement activities, generally, and arrests, specifically. 42 U.S.C. §§ 12134(a) (authority to promulgate regulation), 12206(c)(1) (authority to render technical assistance). In 2006, the Department issued guidance stating that "[l]aw enforcement agencies are covered by [Title II of the ADA] *because they are programs* of State or local governments," and that Title II "*affects virtually everything* that officers and deputies do," including "*arresting*, booking, and holding suspects." U.S. Dep't of Justice, *Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement* § I (Apr. 4, 2006) (emphasis added).[3] The 2006 guidance is consistent with the Department's expansive interpretation of Title II. *See* 28 C.F.R. Pt. 35, App. B ("[T]itle II applies to anything a public entity does.").

---

[3] This guidance merits at least *Skidmore* deference because it reflects "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011) ("[B]ecause Congress directed the Department of Justice (DOJ) to elucidate Title II with implementing regulations, DOJ's views at least would warrant respect and might be entitled to even more deference." (internal quotation marks and footnotes omitted)).

### III.

Lastly, the majority is reluctant to determine whether an arrest qualifies as a service, program, or activity under Title II because—according to it—this is an issue that "courts across the country are divided on . . . ." Maj. Op. at 17-18. Two of our sister circuits have addressed this precise issue to date. In *Sheehan v. City and Cty. of S.F.*, the Ninth Circuit held that arrests are covered by Title II because "[t]he ADA applies broadly to police 'services, programs, or activities.'" 743 F.3d 1211, 1232 (9th Cir. 2014) (quoting 42 U.S.C. § 12132), *rev'd in part on other grounds and cert. dismissed in part as improvidently granted*, 135 S. Ct. 1765 (2015). Conversely, the Fourth Circuit in *Rosen v. Montgomery Cty. Md.* concluded that arrests are not services, programs, or activities because "[t]he terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the State." 121 F.3d 154, 157 (4th Cir. 1997) (quoting *Torcasio v. Murray*, 57 F.3d 1340, 1347 (4th Cir. 1995)).

The Supreme Court, however, squarely rejected *Rosen*'s reasoning in *Yeskey*. *See* 524 U.S. at 211 (rejecting argument "that the words 'eligibility' and 'participation' imply voluntariness on the part of an applicant who seeks a benefit from the State"). Accordingly, "[c]ourts across the country have called *Rosen*'s holding into question in light of the Supreme Court's decision in [*Yeskey*]." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 337 (4th Cir. 2012) (collecting cases); *see, e.g.*, *Thompson v. Davis*, 295 F.3d 890, 897 (9th Cir. 2002) ("[*Rosen*'s] reasoning has now been discredited by the Supreme Court."). Indeed, in *Seremeth*, the Fourth Circuit declined to rely on *Rosen* and held that Title II applies to police interrogations based on the phrase "services, programs, or activities" in addition to the catch-all

6

antidiscrimination phrase. 673 F.3d at 338-39; *id*. at 338 n.2 ("[W]e do not rely on the portion of the district court's decision that depends on the 'program or activity' discussion in *Rosen*").

We therefore need not be troubled by declining to follow *Rosen* and its logic. Rather, we should be cognizant that no court of appeals has held that arrests are not "services, programs, or activities of a public entity," 42 U.S.C. § 12132, since the Supreme Court decided *Yeskey* twenty years ago.

**IV.**

The statutory text, the Department of Justice's interpretations of the text, and the Supreme Court's broad interpretation of the ADA in *Yeskey* establish that arrests are "services, programs, or activities of a public entity" under Title II. 42 U.S.C. § 12132. I therefore see no reason to be less than plain that an arrestee with a disability has two paths to vindicate his or her disability rights.