**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1383
_____

ELIZABETH NACE,
Appellant

v.

PENNRIDGE SCHOOL DISTRICT; ERIC ROMIG, Individually and in his Official
Capacity as Coach for Pennridge School District; JACQUELINE RATTIGAN, Dr.,
Individually and in Her Official Capacity as Superintendent of Pennridge School District;
THOMAS CREEDEN, Individually and in His Official Capacity as Principal of
Pennridge High School; DAVID BABB, Individually and in His Official Capacity as
Athletic Director of Pennridge High School; FAITH CHRISTIAN ACADEMY; RYAN
CLYMER, Individually and in His Official Capacity as Headmaster of Faith Christian
Academy; AND RUSSELL HOLLENBACH, Individually and in His Official Capacity
as Athletic Director of Faith Christian Academy

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2:15-cv-00333)
District Judge: Hon. Wendy Beetlestone
_____

Submitted under Third Circuit L.A.R. 34.1(a)
January 25, 2018
_____

Before: HARDIMAN, VANASKIE, and SHWARTZ, Circuit Judges.

(Filed: August 6, 2018)

_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

Former Pennridge High School student Elizabeth Nace filed this lawsuit against Faith Christian Academy ("FCA"), FCA employees Ryan Clymer and Russell Hollenbach (collectively "FCA Defendants"), Pennridge School District ("Pennridge"), and Pennridge employees David Babb and Thomas Creeden (collectively "Pennridge Defendants"), seeking damages arising from the sexual abuse she experienced at the hands of Defendant Eric Romig, who was a coach at both FCA and Pennridge High School. The District Court granted summary judgment to Pennridge and FCA Defendants. Because there exists a genuine dispute of material fact on at least the duty element of Nace's negligence per se claim under Pennsylvania's abuse-reporting statute, we will vacate the District Court's ruling on that claim and remand for further proceedings. However, because the common law imposes no greater duty upon FCA Defendants to Nace to report Romig's conduct beyond what the statute already requires, the District Court properly granted summary judgment to FCA Defendants on Nace's common law negligence claim. In addition, because Nace's federal-law claims against Pennridge Defendants lack merit, and Creeden and Babb are protected by Pennsylvania statutory tort immunity, we will affirm the District Court's grant of summary judgment to

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

the FCA and Pennridge Defendants on Nace's remaining claims.

I

Romig was FCA's girls' basketball coach from at least 2008 through January 5, 2010. During that time, Clymer was FCA's principal, and Hollenbach was FCA's athletic director. Both Clymer and Hollenbach knew Romig since his childhood. Romig was also the girls' softball coach at Quakertown Community High School ("Quakertown") from 2007 through January 5, 2010. Babb was Romig's direct supervisor at Quakertown until 2009, when Babb left to become the athletic director at Pennridge High School.

While he was an FCA basketball coach, Romig sent over 3,200 text messages over a three-month period to then seventeen-year-old FCA student Emily Mayer, who was a member of the girls' basketball team. Mayer informed Clymer in late December 2009 that she had received inappropriate texts from Romig. By that point, she had deleted all of the text messages from her phone, but she provided Clymer with descriptions of some of the text messages, including one in which Romig allegedly texted Mayer, "I want to be in you," App. 412-13, and others stating that Romig loved her, did not want her to be with her boyfriend, and wanted to marry her. In addition, Mayer suggested that Clymer speak with Lauren Fretz, a former FCA student.

Romig denied that the texts with Mayer contained any sexual content. Nevertheless, Clymer asked Romig to step aside from his coaching duties while Clymer conducted an investigation, in which he relayed at least some information about the

3

accusations to Hollenbach,[1] and spoke to a friend who was a local police chief, the assistant coach of the girls' basketball team, the school's attorneys, and Mayer's parents. Mayer's parents were unable to obtain the content of the text messages, but provided phone logs showing that Mayer and Romig exchanged thousands of texts in the last few months of 2009.

Clymer also contacted Lauren Fretz to investigate whether Romig had an inappropriate relationship with her. Fretz denied having a physical relationship with Romig, but she suggested that Clymer speak with Kristen Kennedy, another former FCA student. Kennedy stated that Romig sent her inappropriate internet messages before and after her FCA graduation, asking about her sexual relations with her boyfriend. She denied having an inappropriate physical relationship with Romig and testified that Romig never suggested that he wanted to be intimate with her.

Based on the investigation and on the advice of school counsel, Clymer asked Romig to resign due to the large volume of texts with Mayer. Romig resigned from both his FCA and Quakertown positions on January 5, 2010, citing health reasons. No one at FCA reported Romig's texting conduct to law enforcement or the Pennsylvania child protective services agencies.

Around that time, Pennridge School District posted an opening for a girls' softball coach for the 2011-2012 school year but did not receive any applications. Given the lack of applications for the position, Babb, now Pennridge's athletic director, contacted

---

[1] The parties dispute the scope of Hollenbach's knowledge of both Mayer's allegations and Clymer's findings resulting from the investigation.

Romig, who had worked under Babb as a girls' softball coach at Quakertown, and spoke with Quakertown's athletic director, who reported no concerns about Romig and said that Romig resigned from Quakertown due to heart issues. Notably, Romig's February 2012 application for the Pennridge softball position contained no reference to FCA or Quakertown but listed Hollenbach as a personal reference. Although Babb did not call any of the listed personal references, Pennridge obtained all required background and criminal history checks, and all background checks cleared. Romig was hired as a softball coach.

After being hired as the girls' softball coach, Romig applied to be Pennridge's girls' basketball coach. He submitted a resume for that position that identified his previous basketball coaching position at FCA. Creeden, Pennridge's principal, and Babb interviewed Romig for the position. When asked why he left FCA, Romig responded that there was a "difference of opinion" or "philosophy" and also noted his heart issues. App. 254.

According to Babb, before the basketball coaching position was filled, he had a conversation with Hollenbach about Romig. Babb asked Hollenbach about Romig's time at FCA, and Hollenbach responded that Romig was a good coach. Hollenbach further disclosed that Romig had left his coaching position at FCA due to an "issue with . . . texting," which was inconsistent with the reasons Romig had given Babb and Creeden for his departure. App. 255. The parties dispute whether any details of the texting issue or Romig's departure were asked for or provided as part of that alleged conversation between Babb and Hollenbach. Babb testified that he told Creeden about the texting

5

issue, and Creeden instructed Babb to "[k]eep an eye on it" and "watch, see if you see anything." App. 256, 258. However, neither Creeden nor Hollenbach recalled the conversations that Babb described. Pennridge ultimately hired a different candidate for basketball coach.

During the 2011-2012 school year, there were no complaints from any students or parents about Romig, and Romig received a positive performance evaluation and returned the following season.

Nace was on Romig's softball team during the 2011-2012 and 2012-2013 school years. She did not report any problems with him during her freshman season. Starting in April 2013, during Nace's sophomore season, Romig began sending Nace text messages in which he commented on her looks, and by June 2013, the texts became sexual. During the summer of 2013, the pair engaged in sexual relations. Nace took steps to hide the relationship, but in late September 2013, her parents discovered her sexual relationship with Romig and contacted the police.

Romig was arrested on October 1, 2013. As part of the police investigation into Romig's conduct with Nace, Bucks County detectives investigated Mayer's allegations. No charges were brought against Romig based on his conduct with Mayer at FCA, but he was charged with and pleaded guilty to child pornography and sexual abuse of a minor offenses for his actions with Nace.

Nace never attended FCA and was not a member of the church affiliated with FCA, but she sued FCA, Clymer, and Hollenbach for negligence and negligence per se, alleging that these defendants failed to report Romig's purported misconduct with Mayer

6

to authorities, and that this failure caused her injury. She also sued Pennridge, Babb, and Creeden, asserting a claim under 42 U.S.C. § 1983 for a violation of her substantive due process rights based on a state-created danger theory, and she sued Babb and Creeden, asserting that they engaged in willful misconduct.[2] The District Court granted summary judgment in favor of FCA Defendants and Pennridge Defendants because (1) FCA Defendants did not owe Nace a legal duty, (2) Pennridge Defendants' conduct did not shock the conscience as required for the state-created danger claim, and (3) Babb and Creeden were protected by Pennsylvania statutory immunity. Nace appeals.

II[3]

A

---

[2] The District Court dismissed other claims, but those rulings are not challenged.

[3] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. Our Court has jurisdiction over the summary judgment order pursuant to 28 U.S.C. § 1291.

Our review of the District Court's order granting summary judgment is plenary. McNelis v. Pa. Power & Light Co., 867 F.3d 411, 414 (3d Cir. 2017). We apply the same standard as the District Court, viewing facts and drawing all reasonable inferences in the non-movant's favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party is entitled to judgment as a matter of law if the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because our review is plenary, we "may affirm the District Court on any grounds supported by the record, even if the court did not rely on those grounds." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014) (internal quotation marks omitted).

7

We first examine Nace's state-law negligence per se and negligence claims against FCA Defendants.

i

"The concept of negligence per se establishes both duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm[.]" J.E.J. v. Tri-Cty. Big Brothers/Big Sisters, Inc., 692 A.2d 582, 585 (Pa. Super. Ct. 1997) (alteration in original) (quoting Braxton v. Commw. Dep't of Transp., 634 A.2d 1150, 1157 (1993)). Nace's negligence per se claim is based on an alleged violation of Pennsylvania's Child Protective Services Law ("CPSL"), which requires school employees and school administrators to report suspected sexual abuse and exploitation of students. Section 6352(a) addresses reporting by school employees and provides:

> (1) Except as provided in paragraph (2), a school employee who has reasonable cause to suspect, on the basis of professional or other training and experience, that a student coming before the school employee in the employee's professional or official capacity is a victim of serious bodily injury or sexual abuse or sexual exploitation[4] by a school employee shall immediately contact the administrator.
>
> (2) If the school employee accused of seriously injuring or sexually abusing or exploiting a student is the administrator, the school employee who has reasonable cause to suspect, on the basis of professional or other training and experience, that a student coming before the school employee in the employee's professional or official capacity is a victim of serious bodily injury or sexual abuse or sexual exploitation shall immediately report to law enforcement officials and the district attorney under section 6353(a) . . . . If

---

[4] "Sexual abuse or sexual exploitation" under this statute includes, inter alia, "[t]he employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct." 23 Pa. Cons. Stat. § 6303.

8

an administrator is the school employee who suspects injury or abuse, the administrator shall make a report under section 6353(a).

23 Pa. Cons. Stat. § 6352(a).[5] Section 6353(a) addresses school administrators and school employees and states:

> An administrator and a school employee governed by section 6352(a)(2) (relating to school employees) shall report immediately to law enforcement officials and the appropriate district attorney any report of serious bodily injury or sexual abuse or sexual exploitation alleged to have been committed by a school employee against a student.

Id. § 6353(a). Sections 6352 and 6353 therefore require schools to report to law enforcement where there is "reasonable cause to suspect" "sexual abuse or sexual exploitation" of a student.[6] See id. § 6353(a).

Here, there is a genuine dispute of material fact as to whether FCA Defendants had reasonable cause to suspect sexual abuse or sexual exploitation of a student that would give rise to a reporting obligation under the CPSL. When Clymer learned of Mayer's texting allegations in December 2009, he investigated them by speaking to Mayer, Mayer's parents, the assistant basketball coach who worked with Romig, two other female FCA students rumored to have experienced inappropriate behavior by Romig, FCA's attorneys, and a friend who was a police chief in another jurisdiction.

---

[5] Sections 6352 and 6353 were repealed on December 30, 2014, but were in effect when FCA learned of Mayer's allegations against Romig in 2009.

[6] Although § 6353(a) requires reporting to law enforcement without explicitly stating that allegations of sexual abuse or exploitation must be supported by "reasonable cause to suspect" such conduct, § 6353(a) expressly incorporates § 6352(a). Thus, both administrators and school employees are obligated to report only allegations supported by "reasonable cause to suspect on the basis of professional or other training and experience" that "sexual abuse or sexual exploitation" of a student has occurred.

Clymer confirmed that Romig had sent Mayer over 3,000 texts between September and December 2009, but the texts had since been deleted. The only remaining evidence of their content was a written record, made by Mayer at her parents' direction, of what the most suggestive messages had said. Romig denied that the texts contained inappropriate content, and Mayer did not assert that Romig had any inappropriate physical sexual contact with her.[7] Clymer also followed up on Mayer's statement that Romig had inappropriate relationships with other FCA students, but these students also denied any physical sexual involvement with Romig.[8] Thus, Clymer was able to confirm that Romig sent Mayer a large number of texts but, on the evidence before him, could not substantiate the "actual proven physical abuse" that he thought the CPSL required. See App. 161.

Even if there was no actual proof of physical abuse, a jury could find Mayer's account of Romig's texts, which allegedly expressed Romig's love and sexual desire for Mayer, combined with the large volume of texts sent by Romig to Mayer and the rumors concerning Romig and other female students, sufficient to provide "reasonable cause to suspect . . . sexual abuse or sexual exploitation." See 23 Pa. Cons. Stat. § 6352(a).

---

[7] When Nace's sexual relationship with Romig was reported to authorities, the Bucks County Police Department investigated Mayer's accusations against Romig as well. Mayer disclosed that Romig had touched her inappropriately on at least one occasion, but during her deposition, she testified that she did not believe that she told Clymer or FCA about this, and Clymer denied having knowledge of any touching. The police did not charge Romig for his conduct with Mayer.

[8] Kennedy testified that she and Romig had had online discussions about intimate details of her relationship with her boyfriend, but she denied that Romig's communications suggested that he wanted to be intimate with her. It is not clear whether she told this to Clymer.

Because a genuine dispute exists as to whether FCA Defendants were required to report Romig's conduct to authorities under the CPSL, we will vacate the District Court's order granting summary judgment to FCA Defendants on Nace's negligence per se claim. On remand, the District Court should proceed to assess whether there exists a genuine dispute of material fact on the other required elements for a negligence per se claim.

ii

In addition to her negligence per se claim, Nace also advances a claim of ordinary negligence. Complaint at 21-23 ¶¶ 122-30, Nace v. Pennridge Sch. Dist., 185 F. Supp. 3d 564 (E.D. Pa. 2016), ECF No. 1. To prove negligence under Pennsylvania law, a plaintiff must establish, among other things, that "the defendant had a duty to conform to a certain standard of conduct." Pyeritz v. Commonwealth, 32 A.3d 687, 692 (Pa. 2011). Whether the defendant owed a duty of care to the plaintiff "is a question of law" determined by the court. Walters v. UPMC Presbyterian Shadyside, __ A.3d __, 2018 WL 3026989, at *3 (Pa. June 19, 2018). Unlike negligence per se, where the requirements of a statute like the CPSL supply the standard of care that the defendant must meet, in ordinary negligence the standard of care is derived from the common law. McCloud v. McLaughlin, 837 A.2d 541, 545 (Pa. Super. Ct. 2003).

Assessing whether a duty exists under the specific facts of a case requires consideration of: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." Althaus ex rel. Althaus v. Cohen, 756 A.2d

11

1166, 1169 (Pa. 2000). No single factor is "alone determinative of the duty question," and the weight accorded to each factor depends on the facts of the case. Walters, 2018 WL 3026989, at *11 (quoting Seebold v. Prison Health Servs., Inc., 57 A.3d 1232, 1246 (Pa. 2012)).

We need not examine each Althaus factor here because ultimately, "determining whether to impose a duty of care in novel circumstances . . . requir[es] policy judgments generally reserved for legislative action." Id. at *4. As the Pennsylvania Supreme Court explained in Walters, "we discern [FCA Defendants'] duty to arise primarily from the expressions of public policy manifest in the governing . . . statutes and regulations, and the priorities they reflect," and "whatever form that duty takes must be traceable to those expressions." Id. at *20. Here, the Pennsylvania legislature's imposition of a duty to report under specific circumstances in the CPSL reflects the legislature's judgment that the burden of reporting is outweighed by its benefits only where there is reasonable cause to suspect sexual abuse or sexual exploitation and where there are protections in place for innocent accused employees.[9] See id. Under the circumstances, imposing a broader common law duty to report may disrupt the careful balancing of interests that the Pennsylvania legislature viewed to be proper. Moreover, given the Pennsylvania

_____

[9] The statutorily-imposed reporting duty under CPSL §§ 6352 and 6353 includes protections for innocent accused employees because reports of abuse or exploitation are kept in a non-public file while under investigation, and such reports do not appear in the statewide database unless and until the report is deemed "founded" or "indicated," which requires a finding of abuse or exploitation by the investigating child welfare authorities or a judicial determination of guilt. See 23 Pa. Cons. Stat. §§ 6303; 6331(1), (2); 6335. Reports deemed unfounded after an investigation concludes are expunged. Id. at § 6331(3); 6337.

12

Supreme Court's "hesitat[ion]" and "reluctance" to impose a new duty in Walters, and that court's stated desire to limit both the scope of that duty and the reach of that decision, see id. at *20-22—and mindful that our task is to "predict how [that court] would resolve the issue" before us, Allstate Prop. & Cas. Ins. Co. v. Squires, 667 F.3d 388, 391 (3d Cir. 2012)—we cannot say that the Pennsylvania Supreme Court would impose a duty on FCA Defendants to protect potential future victims from sexual abuse or exploitation at the hands of third parties that is broader than what the CPSL already requires. Thus, we decline to impose on FCA Defendants a common law duty to further disclose Mayer's unconfirmed allegations of Romig's sexual texting beyond the duty imposed by the CPSL. The District Court therefore did not err in granting summary judgment to FCA Defendants on Nace's common-law negligence claim.

B

We next review Nace's state-created danger claim against Pennridge Defendants. A state-created danger claim requires proof of four elements:

> (1) the harm caused was foreseeable and fairly direct; (2) the state official "acted with a degree of culpability that shocks the conscience"; (3) the state and the plaintiff had a relationship such that "the plaintiff was a foreseeable victim of the defendant's acts"; and (4) the official affirmatively used his authority "in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger" than had he never acted.

Kedra v. Schroeter, 876 F.3d 424, 436 (3d Cir. 2017) (quoting Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006)). Nace has not demonstrated a genuine dispute of material fact on at least the second element, which requires proof of government conduct that is "so egregious, so outrageous, that it may fairly be said to shock the

13

contemporary conscience." L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 246 (3d Cir. 2017) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). The degree of culpability needed for conduct to shock the conscience depends on the context. Id. "[I]n situations where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient" to establish conscience shocking conduct. Id. (internal quotation marks omitted). Deliberate indifference demands a "conscious disregard of a substantial risk of serious harm," which "might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." Id.

Nace does not dispute that Pennridge had time to evaluate applicants for the basketball and softball coaching positions, but the record does not provide a basis for a reasonable jury to find that Pennridge's employment of Romig amounted to deliberate indifference that shocks the conscience. Romig had cleared a background check, had begun coaching at Pennridge without any complaints, and was reported to be a good coach based on Babb's prior experience supervising him at Quakertown. Romig had been accused of improper sexual texting with Mayer over two years earlier while at FCA, but Babb was told only that Romig had an "issue with texting." App. 255. Babb did not ask any follow-up questions, and he and Creeden decided not to investigate further. Under these specific circumstances, Pennridge's conduct does not amount to conscience-shocking deliberate indifference. See, e.g., Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 775-80 (8th Cir. 2001) (affirming an order granting summary judgment to a school that lacked "conclusive proof that [the teacher] actually molested students while employed at

14

[the school]" and was only "aware of rumors, investigations, and student statements"); Kobrick v. Stevens, Civ. No. 3:13-CV-2865, 2017 WL 3839946, at *8-9 (M.D. Pa. Sept. 1, 2017) (finding no deliberate indifference where (1) the school quickly investigated an anonymous tip that the assistant marching band director had sexual contact with a student, and (2) the plaintiff adduced insufficient evidence that the school knew that the assistant marching band director posed a risk); E.R. v. Lopatcong Twp. Middle Sch., Civ. No. 13-1550 (MAS)(DEA), 2015 WL 4619665, at *1-2, *6 (D.N.J. July 31, 2015) (finding no deliberate indifference on the part of a school that (1) was aware that a teacher texted a student, referring to her as "angel" and "babe"; (2) found a box from the student to the teacher saying "I love you BFF"; and (3) received reports from other teachers that the teacher in question was "too close to students" because there were no factual allegations that the school "knew, or even impliedly knew, that [plaintiff] would be harmed by [the teacher] or that . . . sexual abuse was foreseeable").

Nace has not adduced evidence upon which a reasonable juror could find that (1) Pennridge disregarded actual knowledge that Romig would sexually assault a student or (2) Romig posed a plainly obvious risk that should have been known. Accordingly, the District Court correctly granted summary judgment to Pennridge Defendants on Nace's state-created danger claim.

## C

Finally, we evaluate whether Creeden and Babb are entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat. §§ 8541-64, on Nace's intentional tort claim.

15

The PSTCA grants municipal agencies and employees statutory immunity. Section 8541 provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[10] Id. § 8541. In addition, "[m]unicipal employees, including school district employees, are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment." Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (citing 42 Pa. Cons. Stat. § 8545). However, an agency employee is "not immune from liability under § 8545 where [the employee's] conduct amounts to . . . 'willful misconduct.'" Id. (quoting 42 Pa. Cons. Stat. § 8550). "Willful misconduct . . . [is] conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Id. (internal quotation marks omitted).

Drawing all reasonable inferences in Nace's favor, no reasonable juror could find that Creeden and Babb engaged in willful misconduct. The only confirmed conduct about which Creeden and Babb may have been aware was that Romig sent many texts to Mayer. Under these circumstances, no reasonable jury could find that Creeden and Babb "desired" for Nace to be sexually abused by Romig, or that they were aware that such abuse was "substantially certain" to occur. See Sanford, 456 F.3d at 315. Therefore,

_____

[10] There are eight exceptions to § 8541 immunity, but none applies here. 42 Pa. Cons. Stat. § 8542.

16

Creeden and Babb are immune from tort liability under the PSTCA, and the District Court correctly granted summary judgment in their favor on Nace's intentional tort claim.

## III

For the foregoing reasons, we will vacate the District Court's order granting summary judgment to FCA Defendants on Nace's negligence per se claim, affirm the District Court's grant of summary judgment to FCA and Pennridge Defendants on Nace's remaining claims, and remand for further proceedings.