**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3560

_____

M.J.G. by and through her parent and natural guardian, Princess J.; PRINCESS J., in her
individual capacity,
Appellants

v.

SCHOOL DISTRICT OF PHILADELPHIA, COLLETTE LANGSTON, JODI
ROSEMAN, LISA LYNCH, AND CARSON VALLEY CHILDREN'S AID

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-17-cv-00318)
District Judge: Hon. Mark A. Kearney

_____

Argued May 21, 2019
_____

Before: McKEE, SHWARTZ, and FUENTES, <u>Circuit Judges</u>.

(Filed: May 30, 2019)

Zachary A. Meinen, Esq.
Joseph W. Montgomery, II, Esq. [ARGUED]
Montgomery Law
1420 Locust Street, Suite 420
Philadelphia, PA 19102

*Counsel for Appellants*

Alison Morrissey, Esq.
Jeffery M. Scott, Esq. [ARGUED]
Archer & Greiner
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103

Ryan Mulderrig, Esq.
School District of Philadelphia
Office of General Counsel
440 North Broad Street, Suite 313
Philadelphia, PA 19130

  *Counsel for Appellees Philadelphia School District, Colette Langston, Jodi Roseman, Lisa Lynch, and Carson Valley Children's Aid*

William Oleckna, Esq.
Gary M. Samms, Esq. [ARGUED]
Obermayer Rebmann Maxwell & Hippel
1500 Market Street
Centre Square West, Suite 3400
Philadelphia, PA 19102

  *Counsel for Appellee Carson Valley Children's Aid*

_____

OPINION*
_____

SHWARTZ, <u>Circuit Judge</u>.

---

  * This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Plaintiffs MJG[1] and her mother Princess J. appeal the District Court's order granting summary judgment in favor of Defendant Carson Valley Children's Aid ("Carson Valley") and Defendants School District of Philadelphia, Collette Langston, Jodi Roseman, and Lisa Lynch ("School Defendants"). Because the Court properly entered summary judgment for Defendants on Plaintiffs' claims, we will affirm.

I

A

MJG was a student at Swenson Arts and Technology High School in Philadelphia, Pennsylvania. She has Autism Spectrum Disorder and intellectual, social, and language disabilities. MJG was in one of the two life skills classes at Swenson, divided based on the students' ages. In addition to being a student in the life skills class, MJG received additional therapeutic services. Princess sought additional therapy to support MJG through private providers. These providers include a behavioral specialist consultant ("BSC"), who develops a behavior support plan, supervises other support providers, and "collaborate[s] with school personnel to ensure continuity in care," App. 334; and therapeutic staff support ("TSS"), who provide one-to-one behavioral health intervention to promote age-appropriate behavior. The private organizations submit recommendations to Community Behavioral Health ("CBH"), a non-profit contractor for the Pennsylvania Department of Behavioral Health and Intellectual Disability Services. This entity is

---

[1] Although the pleadings refer to Plaintiff as both MJG and MGJ, the operative complaint and its caption refers to Plaintiff as MJG. Accordingly, we use those initials in this Opinion. The appellate docket will also refer to the Plaintiff as MJG.

"responsible for providing behavioral health coverage for the City's . . . Medicaid recipients." App. 696. CBH authorizes all TSS hours, locations, and service delivery and addresses any complaints about services. The School District has neither a contract with nor control over these providers. For the 2014-2015 school year, Green Tree School & Services ("Green Tree") provided MJG's therapy services, and CBH authorized fifteen hours of TSS per week for MJG.

1

In March 2015, MJG told Princess that while in the school library, an intellectually disabled student in MJG's life skills class, RD, had taken her hand and placed it on his penis.[2] Princess contacted her Green Tree BSC, who emailed MJG's teacher Lisa Lynch. Princess, the BSC, Lynch, and MJG met to discuss the incident. Lynch stated that she was watching the students and that MJG's account was "completely false." App. 342. Rather, according to Lynch, MJG tried to get RD to put his arms around her and Lynch reprimanded MJG.[3] Lynch suggested MJG's original account might have been attention-seeking behavior. Even so, Lynch agreed that the school would: (1) increase supervision, (2) change MJG and RD's seats, and (3) relay this plan to other teachers, per Princess's request. Following the 2015 incident, no statements were taken from either MJG or RD and the police were not called, but Lynch prepared a

---

[2] Princess also maintains that in December 2015, MJG relayed that she saw, but was not involved in, students touching each other inappropriately in the library.

[3] MJG confirmed Lynch's account, but Princess told the Green Tree BSC that she believed that MJG accepted Lynch's narrative because she feared the teacher's retaliation.

4

written summary about the meeting for Principal Collette Langston, and Langston directed Lynch to document any additional issues.[4]

In March 2015, Green Tree gave CBH an updated service recommendation for MJG. Green Tree recommended fifteen TSS hours per week for the following school year to, among other things, "increase [MJG's] social skills." App. 109. CBH approved this request. In June 2015, CBH assigned Carson Valley to take over for Green Tree and provide MJG the same fifteen TSS hours per week.

2

In February 2016, MJG came home from school and told Princess and her siblings that she, RD, and a third student went outside at lunch to play tag, RD told her to pull her pants down, and RD blew on her stomach and put his penis on her pelvic area.[5] Princess called the police and MJG's TSS,[6] who immediately called Lynch. Princess then met with a Carson Valley BSC and the police, who both wrote incident reports. The next morning, Princess took MJG to school, where she met with Langston, the dean of students, and the school police officer, all of whom reviewed the surveillance footage of the students from the patio outside the cafeteria. The video did not depict any relevant activity.

---

[4] Langston is responsible for handling serious disciplinary issues. All teachers are required to report any incidents of sexual harassment to the principal and school police, but the school does not determine the veracity of the complaint.

[5] Two aides supervise the 150 students in the cafeteria, and the doors are not locked.

[6] Although MJG indicated that her TSS had left for the day, Carson Valley states that her TSS was not at the school that day.

In addition, at Langston's direction, Lynch and a classroom assistant took statements from RD and the third student. Lynch was not asked to take MJG's statement. According to RD, the three students went outside at lunch, MJG was trying to fix her belt, her pants were loose and fell down, he told her to pick them up, and he helped her with the belt. According to the third student, they went outside to play, and MJG pulled down her pants and was standing in her underwear, prompting both RD and the third student to tell MJG to pick up her pants. The school police officer contacted the Philadelphia Police Department, and officers from the Special Victims Unit ("SVU") went to Swenson to speak to and observe RD.

A Carson Valley psychologist discussed the incident with MJG. She described the event as traumatic for MJG and recommended 32.5 TSS hours per week in light of the trauma and MJG's "safety interfering behaviors." App. 524. CBH determined the extra hours were not medically necessary and denied the request.

The School Defendants composed a "Safety Plan" for MJG, providing: (1) additional staff would be assigned to the cafeteria at lunch, (2) staff would go outside with students at lunch, (3) MJG and RD would be separated and monitored but remain in the same room, (4) MJG would be escorted by an adult during transition times, (5) there would be a daily communication book and weekly emails to update Princess, and (6) an Individual Education Plan ("IEP") meeting would take place to discuss one-on-one

6

supervision for MJG. Princess removed MJG from Swenson and stated that she was not aware that a safety plan was put in place.[7]

B

Plaintiffs brought suit in the Eastern District of Pennsylvania, asserting violations of, among other things, the Americans with Disabilities Act ("ADA"), Title IX of the Civil Rights Act of 1964, and 42 U.S.C. § 1983. Some claims were dismissed and the parties proceeded to discovery on their remaining claims. After discovery, Carson Valley and the School Defendants moved for summary judgment.

The District Court granted both motions, holding, as relevant to the instant appeal: (1) Carson Valley, as a private behavior health service provider, did not act under the color of state law because it did not substitute its own judgment for the School District's, and therefore cannot be liable under § 1983, MJG v. Sch. Dist. of Phila., Civ. No. 17-318, 2017 WL 5010033, at *5 (E.D. Pa. Nov. 2, 2017); (2) MJG did not adduce evidence that the School Defendants' response to both incidents was clearly unreasonable such that they acted with deliberate indifference and are liable for student-on-student harassment under Title IX, id. at *9; (3) the School Defendants did not intentionally discriminate against MJG or act with deliberate indifference under the ADA by failing to separate her and RD into different classrooms, id. at *10-11; and (4) the School Defendants did not act with deliberate indifference or "consciously disregard a substantial risk of serious

_____

[7] It is unclear whether MJG returned to school following the incident.

7

harm" to establish liability under a state-created danger or municipal liability theory, id. at *11-12 (citation omitted).[8] Plaintiffs appeal.

## II[9]

## A

We first address the District Court's holding that Carson Valley is not a state actor and thus cannot be liable under § 1983. Plaintiffs recognize that Carson Valley is a private entity but argue that it may be liable under § 1983 because it has a close nexus and symbiotic relationship with the state.

To recover under § 1983, a plaintiff "must show that the defendants (1) were state actors who (2) violated his rights under the Constitution or federal law." Benn v. Universal Health Sys., Inc., 371 F.3d 165, 169-70 (3d Cir. 2004) (footnote omitted). To

---

[8] Plaintiffs did not oppose the School Defendants' summary judgment motion on Plaintiffs' failure to train or supervise claim against the School District and thus have waived those claims. United States v. Dupree, 617 F.3d 724, 727 (3d Cir. 2010).

[9] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343. We have jurisdiction under 28 U.S.C. § 1291.

Our review of a district court's order granting summary judgment is plenary, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we apply the same standard, viewing the facts and making all reasonable inferences in the non-movant's favor, Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

make a state actor determination, we ask whether "the alleged infringement of federal rights [is] fairly attributable to the State[.]"  Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) (internal quotation marks and citation omitted).  To this end, we consider the facts and circumstances of the particular case, Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961), and examine:

> (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.

Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotation marks and citation omitted).  Each consideration focuses on whether "there is such a close nexus between the state and the challenged action that seemingly private behavior may be treated as that of the state itself."  Id.

None of these considerations show that Carson Valley is a state actor.  First, no party contends that the provision of these therapeutic services is the exclusive prerogative of the state.

Second, Carson Valley and the state did not act in concert.  Carson Valley provides behavior health services for special education students that are paid for by the state.  Although Carson Valley conducts evaluations and recommends services, CBH ultimately approves or denies requests for services and adjudicates complaints about treatment services.  For these reasons, Carson Valley has not acted "with the help of or in concert with" the School District.  Kach, 589 F.3d at 646.

9

Third, Carson Valley does not have a symbiotic relationship with either CBH or the School District.[10] Such a relationship exists "by virtue of the close involvement of the state and interdependence of the actors in the association formed and the challenged activity." Crissman v. Dover Downs Entm't, Inc., 289 F.3d 231, 240-41 (3d Cir. 2002) (en banc). Under this test, we "look first at the relationship and test whether the conduct could be linked to the joint beneficial activities" between the state and private entity. Id. at 241. Carson Valley assigned a BSC to MJG. The BSC collaborated with the school and MJG's teachers, but the school has no contract with or control over the agency. TSS providers are present during the school day, but the BSC is their direct supervisor. Finally, although the state pays for these services, and CBH approves them, "a state contractor and its employees are not state actors simply because they are carrying out a state sponsored program." Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707, 710 (3d Cir. 1993); see id. at 711 (holding no symbiotic relationship between bus company and school district where "the cooperation between the two was only that appropriate to the execution of the subject matter of the contract"); see also Crissman, 289 F.3d at 243

---

[10] Although Plaintiffs did not use the phrase "symbiotic relationship" as a basis to deem Carson Valley a state actor, they argued to the District Court that Carson Valley and the School District acted jointly, Carson Valley coordinated with the School District in an institutionalized process to provide student services, Carson Valley substituted its judgment for that of the School District, and the School District ceded its responsibility to provide one-on-one supervision to Carson Valley. Plaintiffs' arguments sufficiently capture the "symbiotic relationship" consideration, and thus, Plaintiffs did not waive their arguments based on it.

(noting government funding and regulation do not "convert private action to state action").

Because Carson Valley is not a state actor, the District Court correctly granted summary judgment in its favor on Plaintiffs' § 1983 claim.

B[11]

Plaintiffs' Title IX and the ADA claims against the School Defendants also fail. Under Title IX, "recipients of federal funding may be liable for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." Davis ex rel. LaShonda v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 646-47 (1999). When faced with allegations of student-on-student sexual harassment, a school and its officials will be deemed deliberately indifferent where they "cause [students] to undergo harassment or make them liable or vulnerable to it," id. at 645 (alteration in original) (internal quotation marks and citation omitted), and the "response to the harassment or lack thereof is clearly unreasonable in light of known circumstances," id. at 648.[12] Whether the response was clearly unreasonable may be determined as a matter of law. Id. at 649.

---

[11] The District Court noted that MJG did not present arguments opposing summary judgment on the Title IX claim, but it nonetheless analyzed the claim. MJG, 2017 WL 5010033, at *8 n.85. Because the Court ruled on the merits of this claim, we will address it too.

[12] The exact nature of the conduct and alleged harassment is disputed here, but we assume that it satisfies the predicate for a Title IX claim. See Davis, 536 U.S. at 653 (stating Title IX provides a basis for student-on-student harassment "only where the

11

To prevail on an ADA claim, the plaintiff must demonstrate that she: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." S.H. ex rel. Durell v. Lower Merion Sch. Dist., 729 F.3d 248, 260 (3d Cir. 2013) (citation omitted). To receive compensatory damages, a plaintiff must prove intentional discrimination, which, like a Title IX violation, may be satisfied by showing deliberate indifference. Id. at 263-64; see Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 273 (3d Cir. 2014) (applying deliberate indifference standard to Title IX and ADA claims). Deliberate indifference requires both knowledge that a right is likely to be violated and a "failure to act despite that knowledge." S.H., 729 F.3d at 265. Thus, to succeed on both their Title IX and ADA claims, Plaintiffs must show that the School Defendants were deliberately indifferent to MJG's circumstances.

Here, no reasonable jury could find that the School Defendants caused either the March 2015 or February 2016 incidents with RD to occur and that their responses after each were clearly unreasonable. After the March 2015 event, Lynch, the Green Tree BSC, MJG, and Princess met. Even though Lynch believed there was no misconduct, she indicated that MJG and RD would be physically separated and monitored, per District policy. In addition, in accordance with the District Policy, Lynch provided Langston with a written summary documenting the meeting with the Carson Valley BSC, Princess,

---

behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect").

and MJG.[13]  Eleven months passed before the second incident involving MJG and RD, and nothing was reported in the interim.  While MJG and Princess insist more should have been done, such as create a new life skills class or send the students to different schools, the School Defendants' response to the incident cannot be said to have been unreasonable in light of the allegations, as it included physically separating and monitoring the students while in class.

Following the 2016 incident, Langston, Princess, the dean, and the school police officer met.  Thereafter, Lynch and a classroom assistant took statements from RD and the third student.  In addition, the school police officer contacted the Philadelphia Police Department, prompting an investigation by the SVU, which apparently resulted in no charges.  Finally, the School Defendants prepared a "Safety Plan" that provided for regular communication with Princess, an escort for MJG during transition times at school, separation and monitoring of RD and MJG, additional lunch supervision, and new bus routes if they took the same school bus.[14]  Even if other steps could have been

---

[13] Plaintiffs assert that the document describing Lynch's separation and monitoring plan, emailed to Langston, "does not prove whether students were actually separated, how long they were separated, or to what extent they were separated."  Appellants' Br. at 41-42.  Plaintiffs further argue, "[i]f the separation and supervision had occurred as stated, [Princess] would have no reason to keep MJG out of school on April 22, 2015 or mistrust Lynch . . . . [R]D and MJG may have only been separated for 10 minutes during that single day in the computer lab."  Appellants' Br. at 42 (citation omitted).  Plaintiffs present no evidence to support this assertion, beyond the fact that MJG was not in school one day, nearly a month after the 2015 incident and following Princess's complaints about Lynch.  Plaintiffs also rely on the report of Dr. John H. Regan, composed after the 2016 incident, concluding that despite the 2015 incident, RD remained in MJG's classroom.  App. 247.  This fact is not disputed.

[14] The "Safety Plan" also provided that an IEP meeting would be held to discuss providing MJG with a one-on-one assistant.  App. 777.

taken, no reasonable juror could conclude that the School Defendants were deliberately indifferent to the incidents given the detailed safety plan they were prepared to implement. See Ings-Ray v. Sch. Dist. of Phila, No. Civ.A 02-CV-3615, 2003 WL 21250556, at *4 (E.D. Pa. Apr. 30, 2003) (holding no deliberate indifference where school responded to harassing behavior by immediately investigating the incident, meeting with the harasser's parents, obtaining a confession from and suspending the harasser, providing individual counseling and group sexual education, and increasing supervision); see also Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 144 (2d Cir. 1999) (holding teacher did not act clearly unreasonably by deciding to "keep an open eye" on things after one incident of racial name-calling); cf. DiStiso v. Cook, 691 F.3d 226, 245 (2d Cir. 2012) (holding a jury could find a principal acted clearly unreasonably when he did nothing other than speak to a teacher following kindergarten racial-name calling). Furthermore, the Supreme Court directs us to give some deference to how schools handle events on school grounds and to take care not to dictate that school officials may "avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." Davis, 526 U.S. at 648.

Because no reasonable juror could find that the School Defendants were deliberately indifferent to MJG's circumstances or that their responses were clearly

14

unreasonable, the District Court properly granted summary judgment for the School Defendants on MJG's Title IX and ADA claims.[15]

C

The School Defendants are also not liable to MJG for a substantive due process violation under § 1983. While schools generally do not have an obligation to protect students, they may be liable for a student's harm if "the state acts to create or enhance a danger that deprives the plaintiff of his" due process rights. Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006) (per curiam) (emphasis omitted). This type of due process claim, known as the state-created danger theory, requires proof of four elements, including that "a state actor acted with a degree of culpability that shocks the conscience." Id. at 304-05.

While "the state actor's behavior must always shock the conscience," id. at 310 (emphasis omitted), the specific "level of culpability required to shock the conscience increases as the time to deliberate decreases," id. at 309. Where state actors have an opportunity to deliberate and make "'unhurried judgments,' deliberate indifference is

---

[15] Moreover, the record does not show that the School Defendants discriminated against MJG as compared to non-disabled students. Swenson had two life skills classes, divided based on the students' ages. Because MJG and RD were in the same age group and had similar educational needs, and there was no other class to accommodate them, a plan was put in place to keep them separated and constantly monitored. Plaintiffs have not adduced evidence that the failure to offer multiple classrooms constitutes discrimination, or that non-disabled students under similar circumstances would be separated into different classrooms. For this additional reason, the District Court correctly granted summary judgment for the School Defendants on Plaintiffs' ADA claim.

15

sufficient."[16]  Id.  Here, the School District Defendants were able to make unhurried judgments.

For substantially the same reasons provided with respect to Plaintiffs' Title IX and ADA claims, Plaintiffs have not produced evidence showing that the School Defendants were deliberately indifferent or that their actions were conscience-shocking.  After the first incident, MJG and RD were separated during classroom time, but free to sit together at lunch and during other unstructured times.  Eleven months passed without incident, so we cannot conclude that the risk of sexual assault was so obvious.  After the second incident, the School Defendants immediately responded with an internal investigation, contacted the school police, and established a safety plan.[17]

---

[16] The level of culpability required to shock the conscience varies depending on the amount of time the state actors had to respond to a given situation:

> [A]lthough intent to cause harm must be found in a "hyperpressurized environment," where officials are afforded the luxury of a greater degree of deliberation and have time to make "unhurried judgments," deliberate indifference is sufficient to support an allegation of culpability. . . . [W]here the circumstances require a state actor to make something less exigent than a "split-second" decision but more urgent than an "unhurried judgment," i.e., a state actor is required to act "in a matter of hours or minutes," a court must consider whether a defendant disregarded a "great risk of serious harm rather than a substantial risk."

Phillips v. County of Allegheny, 515 F.3d 224, 241 (3d Cir. 2008) (quoting Sanford, 456 F.3d at 306) (internal citations omitted).

[17] To establish a state-created danger, a plaintiff must also prove that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Sanford, 456 F.3d at 304-05, 311.  Although the line between action and inaction is not clear, Morrow v. Balaski, 719 F.3d 160, 177 (3d Cir. 2013), the mere failure to protect, couched as an affirmative action, is not enough to satisfy this element.  Sanford, 456 F.3d at 312; see Morrow, 719 F.3d at 178-179 (holding failure to enforce a disciplinary policy

Because no reasonable juror could find that the School Defendants were deliberately indifferent or engaged in conduct that shocked the conscience, Plaintiffs are not entitled to § 1983 relief.[18]

III

For the foregoing reasons, we will affirm.

---

and suspend a bully student with no-touch orders for the plaintiffs was not an affirmative act). Here, Plaintiffs argue that the School Defendants failed to separate MJG and RD into different classrooms, allowed them to leave at lunch, and failed to provide one-on-one supervision. These "failures," however, are not affirmative conduct that exposed MJG to greater harm. See L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 242-43 (3d Cir. 2016) (holding defendants' efforts to describe the defendant's conduct as mere failures to act was "unavailing"). Thus, no reasonable juror could find that the School Defendants affirmatively created a danger that exposed MJG to sexual assault.

[18] Because Plaintiffs have failed to establish a predicate constitutional violation, their claim for municipal liability also fails. See Startzell v. City of Philadelphia, 533 F.3d 183, 204 (3d Cir. 2008).